**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| BLACKBIRD TECH LLC d/b/a BLACKBIRD TECHNOLOGIES, <br><br> Plaintiff, <br><br> v. <br><br> ELB ELECTRONICS, INC., <br><br> Defendant. | C.A. No. 15-cv-056-RGA |
| BLACKBIRD TECH LLC d/b/a BLACKBIRD TECHNOLOGIES, <br><br> Plaintiff, <br> v. <br><br> ETI SOLID STATE LIGHTING, INC., <br><br> Defendant. | C.A. No. 15-cv-057-RGA |
| BLACKBIRD TECH LLC d/b/a BLACKBIRD TECHNOLOGIES, <br><br> Plaintiff, <br><br> v. <br><br> FEIT ELECTRIC COMPANY, INC., <br><br> Defendant. | C.A. No. 15-cv-058-RGA |
| BLACKBIRD TECH LLC d/b/a BLACKBIRD TECHNOLOGIES, <br><br> Plaintiff, <br> v. <br><br> PLUSRITE USA, CORP., <br><br> Defendant. | C.A. No. 15-cv-062-RGA |

## JOINT CLAIM CONSTRUCTION BRIEF

OF COUNSEL:

Wendy Verlander
wverlander@blackbird-tech.com
Christopher Freeman
cfreeman@blackbird-tech.com
Sean K. Thompson
sthompson@blackbird-tech.com
Blackbird Technologies
One Boston Place, Suite 2600
Boston, MA 02108
617.307.7100


OF COUNSEL:

John M. Hintz
MAYNARD, COOPER & GALE, P.C.
The Fred F. French Building
551 Fifth Avenue – Suite 2000
New York, NY  10176
(646) 609-9284
jhintz@maynardcooper.com


OF COUNSEL:

D. Peter Hochberg
Walter | Haverfield LLP
The Tower at Erieview
1301 East 9th Street, Suite 3500
Cleveland, OH  44114-1821
(216) 928-2903
(216) 916-2445
dphochberg@walterhav.com

STAMOULIS & WEINBLATT LLC

Stamatios Stamoulis #4606
stamoulis@swdelaw.com
Richard C. Weinblatt #5080
weinblatt@swdelaw.com
Two Fox Point Centre
6 Denny Road, Suite 307
Wilmington, DE 19809
Telephone: (302) 999-1540

Attorneys for Plaintiff
Blackbird Tech LLC d/b/a
Blackbird Technologies

MORRIS, NICHOLS, ARSHT & TUNNELL
LLP
Karen Jacobs (#2881)
Michael J. Flynn (#5333)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 351-9661
kjacobs@mnat.com
mflynn@mnat.com

*Attorneys for Defendants ELB Electronics,
Inc. and Feit Electric Company, Inc.*

POTTER ANDERSON & CORROON LLP
Philip A. Rovner (#3215)
Jonathan A. Choa (#5319)
Alan R. Silverstein (#5066)
Hercules Plaza
P.O. Box 951
Wilmington, DE  19899
(302) 984-6000
provner@potteranderson.com
jchoa@potteranderson.com
asilverstein@potteranderson.com

*Attorneys for Defendant ETi Solid State
Lighting Inc.*

OF COUNSEL:

David C. Radulescu, Ph.D.
Tigran Vardanian

RADULESCU LLP
350 Fifth Avenue, Suite 6910
New York, NY 10118
(646) 502-5950
david@radip.com
tigran@radip.com

POTTER ANDERSON & CORROON LLP
Philip A. Rovner (#3215)
Jonathan A. Choa (#5319)
Alan R. Silverstein (#5066)
Hercules Plaza
P.O. Box 951
Wilmington, DE  19899
(302) 984-6000
provner@potteranderson.com
jchoa@potteranderson.com
asilverstein@potteranderson.com

*Attorneys for Defendant PlusRite USA Corp.*

# TABLE OF CONTENTS

I.      PLAINTIFF'S INTRODUCTION ........................................................................ 1

II.     DEFENDANTS' INTRODUCTION ..................................................................... 2

III.    PLAINTIFF'S BACKGROUND .......................................................................... 4

IV.     DEFENDANTS' BACKGROUND ....................................................................... 6

V.      AGREED-UPON CONSTRUCTIONS ................................................................ 8

VI.     DISPUTED CONSTRUCTIONS ......................................................................... 9

    A.    "HOUSING" ....................................................................................................... 9

        1.    Plaintiff's Opening Position ................................................................... 9

        2.    Defendants' Answering Position ......................................................... 12

        3.    Plaintiff's Reply Position .................................................................... 16

        4.    Defendants' Sur-Reply Position .......................................................... 19

    B.    "ATTACHMENT SURFACE" ............................................................................ 21

        1.    Plaintiff's Opening Position ................................................................. 21

        2.    Defendants' Answering Position ......................................................... 24

        3.    Plaintiff's Reply Position .................................................................... 28

        4.    Defendants' Sur-Reply Position .......................................................... 33

    C.    "ILLUMINATION SURFACE" ......................................................................... 35

        1.    Plaintiff's Opening Position ................................................................. 35

        2.    Defendants' Answering Position ......................................................... 37

        3.    Plaintiff's Reply Position .................................................................... 40

        4.    Defendants' Sur-Reply Position .......................................................... 43

    D.    "PROTRUDE THROUGH" ................................................................................ 44

        1.    Plaintiff's Opening Position ................................................................. 44

        2.    Defendants' Answering Position ......................................................... 46

        3.    Plaintiff's Reply Position .................................................................... 50

        4.    Defendants' Sur-Reply Position .......................................................... 55

    E.    "FASTENING MECHANISM" ........................................................................... 58

        1.    Plaintiff's Opening Position ................................................................. 58

        2.    Defendants' Answering Position ......................................................... 65

        3.    Plaintiff's Reply Position .................................................................... 71

        4.    Defendants' Sur-Reply Position .......................................................... 76

# TABLE OF AUTHORITIES

## Cases

*Apex Inc. v. Raritan Computer, Inc.*,
325 F.3d 1364 (Fed. Cir. 2003) ................................................................ 58-59, 71, 75

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*,
512 F.3d 1338 (Fed. Cir. 2008) ................................................................ 54

*Bd. of Regents of the U. of Texas System v. BENQ Am. Corp.*,
533 F.3d 1362 (Fed. Cir. 2008) ................................................................ 24

*Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*,
249 F.3d 1341 (Fed. Cir. 2001) ................................................................ 45

*Bonutti Research, Inc. v. Lantz Med., Inc.*,
2016 WL 247752 (S.D. Ind. Jan. 21, 2016) ................................................ 60

*Budde v. Harley-Davidson, Inc.*,
250 F.3d 1369 (Fed. Cir. 2001) ................................................................ 76

*Clarian Health Partners, Inc. v. Leavitt*,
2006 WL 2661477 (S.D. Ind. Sept. 15, 2006) ........................................... 71

*Compressor Prod. Int'l LLC v. Graco, Inc.*,
2013 WL 6865541 (S.D. Tex. Nov. 19, 2013) ........................................... 12

*Dana Corp. v. Am. Axle & Mfg., Inc.*,
110 F. App'x 871 (Fed. Cir. 2004) ........................................................... 21

*Eon Corp. IP Holdings v. Silver Spring Networks*,
815 F.3d 1314 (Fed. Cir. 2016) ................................................ 18-19, 50, 55

*Felix v. Am. Honda Motor Co.*,
562 F.3d 1167 (Fed. Cir. 2009) ........................................................... 20, 56

*Flo Healthcare Sols., LLC v. Kappos*,
697 F.3d 1367 (Fed. Cir. 2012) .............................................. 61, 62, 67, 72, 74

*Georgia-Pacific Corp. v. U.S. Gypsum Co.*,
195 F.3d 1322 (Fed. Cir. 1999). ......................................................... 20, 56

*Greenberg v. Ethicon Endo Surgery, Inc.*,
91 F.3d 1580 (Fed. Cir. 2008) ............................................... 60, 66-67, 72, 76

*Hubbell, Inc. v. Pass & Seymour, Inc.*,
781 F. Supp. 2d 67 (D. Conn. 2011) ....................................................... 60

*i4i Ltd. Partn. v. Microsoft Corp.*,
    598 F.3d 831 (Fed. Cir. 2010) .......................................................................... 22-23

*Intell. Ventures I LLC v. AT&T Mobility LLC*,
    2016 WL 4363485 (D. Del. Aug. 12, 2016) ..................................................... 68, 74

*Inventio AG v. ThyssenKrupp Elevator Americas Corp.*,
    649 F.3d 1350 (Fed. Cir. 2011) ............................................. 61, 62, 74, 78

*Kara Tech. Inc. v. Stamps.com Inc.*,
    582 F.3d 1341(Fed. Cir. 2009) ...................................................... 12, 22, 52

*Kenall Mfg. Co. v. H.E. Williams, Inc.*,
    2013 WL 427119 (N.D. Ill. Feb. 1, 2013)..................................................... 12

*Koninklijke Philips Elecs. N.Y. v. Cardiac Sci. Operating Co.*,
    590 F.3d 1326 (Fed. Cir. 2010) ..................................................... 31-32

*Lifeport Scis. LLC v. Endologix, Inc.*,
    2015 WL 4141819 (D. Del. July 9, 2015) ..................................... 68, 74, 78

*Lighting World, Inc. v. Birchwood Lighting, Inc.*,
    382 F.3d 1354 (Fed. Cir. 2004) ..................................................... 59, 73

*M2M Solutions LLC v. Sierra Wireless Am., Inc.*,
    2015 WL 5826816 (D. Del. Oct. 2, 2015) ............................................ 78

*Mass. Inst. Tech. for Imaging, Inc. v. Abacus Software*,
    462 F.3d 1344 (Fed. Cir. 2006) ............................................. 66, 69, 73, 76

*Merck & Co., Inc. v. Teva Pharm. USA, Inc.*,
    395 F.3d 1364 (Fed. Cir. 2005) ..................................................... 36

*Micro Chem., Inc. v. Great Plains Chem. Co., Inc.*,
    194 F.3d 1250 (Fed. Cir. 1999) ..................................................... 63

*Neonatal Prod. Group, Inc. v. Shields*,
    2016 WL 1746788 (D. Kan. May 3, 2016)..................................................... 60-61

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
    521 F.3d 1351 (Fed. Cir. 2008)..................................................... 47, 50

*Personalized Media Commc'ns , LLC v. Int'l Trade Commn.*,
    161 F.3d 696 (Fed. Cir. 2011) ..................................... 60, 67, 72, 73, 76

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)..................................................... *passim*

iii

*Pickholtz v. Rainbow Techs., Inc.*,
  284 F.3d 1365 (Fed. Cir. 2002) ............................................................. 40

*Poly–America, L.P. v. API Indus., Inc.*,
  2016 WL 5956745 (Fed. Cir. Oct. 14, 2016). .......................................... 34

*Power Mosfet Techs., L.L.C. v. Siemens AG*,
  378 F.3d 1396 (Fed. Cir. 2004) ............................................................. 39

*Randall May Int'l, Inc. v. DEG Music Prod., Inc.*,
  378 F. App'x 989 (Fed. Cir. 2010) ................................................... 14, 18

*Renishaw PLC v. Marposs Societa'per Azioni*,
  158 F.3d 1243 (Fed. Cir. 1998) ............................................................. 21

*Robert Bosch, LLC v. Pylon Mfg. Corp.*,
  2010 WL 1417874 (D. Del. Mar. 30, 2010) .............................. 46, 50, 52

*S.C. Johnson & Son, Inc. v. The Dial Corp.*,
  571 F. Supp. 2d 984 (W.D. Wis. 2008) ............................... 47-48, 52, 55

*SimpleAir, Inc. v. Sony Ericsson Mobile Commc'ns AB*,
  820 F.3d 419 (Fed. Cir. 2016) ............................................................. 39

*Smith v. ORBCOMM, Inc.*,
  2015 WL 5302815 (E.D. Tex. Sept. 10, 2015) ........................... 27, 30-31

*Southwall Techs., Inc. v. Cardinal IG Co.*,
  54 F.3d 1570 (Fed. Cir. 1995) ............................................................. 56

*Straight Path IP Group, Inc. v. Sipnet EU S.R.O.*,
  806 F.3d 1356 (Fed. Cir. 2015) ...................................................... 28-29

*Summit 6, LLC v. Samsung Elecs. Co., Ltd.*,
  802 F.3d 1283 (Fed. Cir. 2015) ............................................................. 45

*Tobinick v. Olmarker*,
  753 F.3d 1220 (Fed. Cir. 2014) ............................................................. 31

*Triplay, Inc. v. Whatsapp, Inc.*,
  2016 WL 3574012 (D. Del. June 30, 2016) ............................................ 59

*U.S. Ethernet Innovations, LLC v. Acer, Inc.*,
  646 F. App'x. 929 (Fed. Cir. 2016) ....................................................... 29

*Vederi, LLC v. Google, Inc.*,
  744 F.3d 1376 (Fed. Cir. 2014) ...................................................... 35-36

*Viatech Techs., Inc. v. Microsoft Corp.*,
  2016 WL 3398025 (D. Del. June 14, 2016) ...................................................... 68, 74

*Watts v. XL Sys., Inc.*,
  232 F.3d 877 (Fed. Cir. 2000) ................................................................................ 65

*Welker Bearing Co. v. PHD, Inc.*,
  550 F.3d 1090 (Fed. Cir. 2008) ....................................................... 66, 67, 71, 72

*White v. Dunbar*,
  119 U.S. 47 (1886) .................................................................................................. 44

*Williamson v. Citrix Online, LLC*,
  792 F.3d 1339 (Fed. Cir. 2015) ..................................................................... *passim*

*WMS Gaming, Inc. v. Intl. Game Tech.*,
  184 F.3d 1339 (Fed. Cir. 1999) ............................................................................. 63

## Statutes

35 U.S.C. § 112 ................................................................................................. *passim*

35 U.S.C. § 132 ....................................................................................................... 25

## I.  PLAINTIFF'S INTRODUCTION

In the early 2000s, Lyman O. Nielson and Norman B. Hess, lighting industry veterans with years of experience developing lighting technology, invented a variety of apparatus and methods for retrofitting fluorescent light fixtures with new, more energy efficient light-emitting diode ("LED") lighting.  Certain of these inventions were described and claimed in U.S. Patent No. 7,086,747 (the "'747 patent").  Years later, LED tube lights containing the core structure described in the '747 patent entered widespread use as the primary means of retrofitting fluorescent light fixtures with updated energy efficient LEDs.

The plain language of the asserted claims of the '747 patent—claims 12 and 29—recite a straightforward lighting apparatus and method.  Defendants, however, seek to improperly narrow the plain language of the claims through construction.  In particular, Defendants seek to narrow claims 12 and 29 by reading limitations supposedly found in the embodiment depicted in Figure 5 of the '747 patent into multiple claim terms.  Not only do Defendants' arguments run contrary to the Federal Circuit's well-defined law prohibiting limiting claims based on disclosed embodiments, they also, with respect to certain claim terms, are in direct conflict with the prosecution history.  It is a "bedrock principle" of law that the claims—as issued—define the invention.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005).  Defendants should not be permitted to alter the plain meaning of the claims in a manner that conflicts with settled Federal Circuit precedent.

Plaintiff's proposed constructions are grounded in the intrinsic evidence and comport with relevant extrinsic evidence.  Accordingly, Plaintiff respectfully requests that the Court adopt its proposed constructions.

## II.  DEFENDANTS' INTRODUCTION

Plaintiff Blackbird Tech LLC d/b/a Blackbird Technologies ("Blackbird") takes an overly-expansive view of the asserted claims of U.S. Patent No. 7,086,747 (" the '747 patent") in an effort to support its serial infringement cases against Defendants ELB Electronics, Inc., ETi Solid State Lighting Inc., Feit Electric Company, Inc., and PlusRite USA Corp. (together, "Defendants").

Blackbird's so-called "straightforward" lighting apparatus and method in claims 12 and 29 of the '747 patent are directed to a retrofit apparatus and method, respectively, where light emitting diodes ("LEDs") are used to provide after-hours, low-level, or emergency lighting by attaching the retrofit apparatus to an existing fluorescent lighting fixture.  As explained in the specification, the claimed apparatus and method are intended to function as a retrofit wherein a housing containing LEDs is attached to the ballast cover of an existing fluorescent lighting fixture.

However, Blackbird alleges infringement by Defendants' accused LED products, which are different both structurally and in their intended purpose: to replace conventional fluorescent bulbs in lighting fixtures for general use, not solely for after-hours, low-light, or emergency applications.  Because the accused products are completely different from the claimed invention, Blackbird's proposed constructions seek to broaden the claims beyond what is disclosed in the specification in an effort to manufacture infringement.

The substantial broadening of the asserted claims that Blackbird advocates lacks specification support and runs contrary to Federal Circuit precedent.  In contrast, Defendants' constructions properly provide the disputed claim terms with meaning and scope commensurate with the alleged inventions disclosed in the '747 patent.  For example, Blackbird proposes that the disputed term "protrude through" be construed to have its "plain meaning," or, alternatively,

a construction that does not resolve the parties' dispute over the scope of this term.  Blackbird would rather postpone or delegate construction of "protrude through" to the jury than be held to the meaning provided in the intrinsic record, as advocated by Defendants.  Similarly, Blackbird proposes constructions of the terms "housing" and "illumination surface" that disregard the claim language and the description of these terms in the specification in an effort to broaden the asserted claims beyond the scope of the alleged invention.

Blackbird faces other hurdles as well.  As explained in Defendants' motion to dismiss and supporting briefs (D.I. 9, 10 and 14 in C.A. No. 15-057-RGA), the '747 patent is invalid for failure to meet the written description requirement of 35 U.S.C. § 112.  Blackbird, recognizing that problem, excludes limitations from the claim term "attachment surface" that are required by the specification.  Blackbird asks the Court to embrace a meaning for "attachment surface" that has neither written description nor enablement support in the specification.  Due to an Examiner's Amendment entered immediately prior to issuance of the '747 patent, the asserted claims describe the attachment of two parts of the claimed lighting apparatus — the "illumination surface" and the "attachment surface" — but there is no description in the specification of these two surfaces being fastened together, let alone any teaching of how to fasten them.

Lastly, Blackbird's proposed construction of the term "fastening mechanism" attempts to avoid the limited scope afforded to means-plus-function terms.  Contrary to Blackbird's assertions, the phrase "fastening mechanism for securing the attachment surface of the lighting apparatus to the illumination surface" is written in a means-plus-function format because it is functional and does not describe any structure to perform the claimed "securing the attachment surface of the lighting apparatus to the illumination surface."  Consequently, the requirements of

35 U.S.C. § 112, ¶ 6 apply, and the structure must be strictly limited to those corresponding structures disclosed in the '747 patent specification and equivalents thereto.

Contrary to Plaintiff's assertions in its Introduction, Defendants do not propose unnecessary limitations but instead propose constructions that reflect the scope of the claimed invention. Rather, it is Blackbird that advocates constructions that are contrary to the intrinsic evidence and Federal Circuit law. Accordingly, Defendants' proposed constructions should be adopted.

## III.  PLAINTIFF'S BACKGROUND

The '747 patent discloses a variety of "lighting apparatus for use in buildings" and methods relating thereto. (A008 ('747 patent) at 1:16-17.[1]) In particular, the '747 patent discloses energy-efficient lighting apparatus that can be retrofit with existing fluorescent light fixtures. (*See, e.g.*, *id*. at 2:65-3:49.)

Claim 12 recites one such lighting apparatus. It is reproduced below with the disputed terms emphasized:

> An energy-efficient lighting apparatus for retrofit with an existing light fixture having a ballast cover, comprising:
>
> > a ***housing*** having an ***attachment surface*** and an ***illumination surface***;
> >
> > a plurality of illumination surface holes in the illumination surface;
> >
> > a circuit board comprising a plurality of light-emitting diodes, wherein the circuit board is positioned adjacent the housing so that the plurality of light-emitting diodes ***protrude through*** the plurality of illumination surface holes in the illumination surface; and
> >
> > a ***fastening mechanism for securing the attachment surface of the lighting apparatus to the illumination***

---

[1] "A__" refers to the page numbers of the Joint Appendix.

> *surface*, wherein the lighting apparatus is coupled to a wall switch and wherein the illumination of the light-emitting diodes is controllable based upon the position of the wall switch.

Thus, claim 12 recites a LED lighting apparatus that possesses particular structural characteristics and is "for retrofit with an existing light fixture having a ballast cover," *i.e.*, the portion of the lighting fixture that covers the ballast, which is an electric starting and control mechanism for fluorescent lamps.  Specifically, the claims recite a LED lighting apparatus structure comprising a "housing," which has at least two surfaces: an "attachment surface" and an "illumination surface."  The claims specify that the "attachment surface" is secured to the "illumination surface" with a "fastening mechanism."  The apparatus also contains a circuit board, on which are mounted LEDs, which is positioned so that the LEDs "protrude through" the "illumination surface" of the housing.

Figure 5 of the '747 patent depicts a "side plan view" of an embodiment of the invention recited in claim 12.  (A007 ('747 patent) at Fig. 5.)  It is reproduced below with annotations showing the illumination surface (532, in red), attachment surface (530, in green), and circuit board (511, in purple):



Fig. 5

Asserted claim 29, which is a parallel method claim to claim 12, recites a "method for retrofitting a light fixture with an [LED] lighting apparatus, the light fixture having a ballast cover." (A013 ('747 patent) at 12:52-68.)

## IV. DEFENDANTS' BACKGROUND

The '747 patent is aimed at providing apparatuses and methods for satisfying low light requirements more energy-efficiently than light fixtures known at the time of the alleged invention, such as fluorescent light fixtures. (A008 ('747 patent) at 1:33-2:20.) The '747 patent discloses two different embodiments. The first embodiment, one in which a ballast cover is a component of the allegedly inventive "lighting apparatus" itself, is not at issue here. (*See, e.g.*, A003-4 ('747 patent), Figures 1 and 2.) In the second embodiment, the subject of asserted claims 12 and 29, a ballast cover is a component of the existing light fixture to which the claimed "lighting apparatus" is retrofitted, rather than part of the claimed "lighting apparatus." (*See* A012 ('747 patent) at 9:1-10.) The retrofit lighting apparatus and method for retrofitting of claims 12 and 29 do not replace existing light fixtures. (*Id*.) Rather, the claimed retrofit lighting apparatus is a housing with protruding LEDs that attaches to the ballast cover of the existing light fixture.

Claim 12 reads as follows (disputed claim terms appear in bold italics):

1. An energy-efficient lighting apparatus for retrofit with an existing light fixture having a ballast cover, comprising:

a ***housing*** having an ***attachment surface*** and an ***illumination surface***;

a plurality of illumination surface holes in the illumination surface;

a circuit board comprising a plurality of light-emitting diodes, wherein the circuit board is positioned adjacent the housing so that the plurality of light-emitting diodes ***protrude through*** the plurality of illumination surface holes in the illumination surface; and

a ***fastening mechanism for securing the attachment surface of the lighting apparatus to the illumination surface***, wherein the lighting apparatus is coupled to a wall switch and wherein the illumination of the light-emitting diodes is controllable based upon the position of the wall switch.

All of the disputed terms of claim 12 also appear in claim 29, with the exception of "fastening mechanism for securing the attachment surface of the lighting apparatus to the illumination surface." Claim 29 is a method claim directed to the retrofit of an existing light fixture with the lighting apparatus of claim 12.

Figure 5 of the '747 patent, annotated below in color to show the location of relevant components, illustrates an embodiment of the claimed invention and the claim terms at issue:



**Fig. 5**

The attachment surface (530) and the illumination surface (532) form opposite surfaces of the housing (528), which encloses the circuit board (511). Light-emitting diodes (504), which are coupled to the circuit board, protrude through the illumination surface (532). (*See* A012 ('747 patent) at 9:11-35.) The entire lighting apparatus is secured to the ballast cover within a light fixture by a "fastening mechanism" (534). (*Id.* at 9:36-38.) Importantly, Blackbird's annotated figure on page 64 *infra* misidentifies the "fastening mechanism" by pointing to the

edges of the housing (528) and not to the double-sided adhesive strip which is the ***only***

"fastening mechanism" (534) illustrated in Figure 5 and shown above in blue.

## V.  AGREED-UPON CONSTRUCTIONS

On November 4, 2016, Plaintiff withdrew its assertion of claim 29.  There were no

disputed claim terms proposed for construction that were unique to claim 29.  With regard to

agreed-upon constructions, Plaintiff does not object to the entry of an order construing the terms

of claim 29 as previously agreed.

| Claim(s) | Term/Phrase | Agreed Construction |
|---|---|---|
| 12 | an energy efficient lighting apparatus for retrofit with an existing light fixture having a ballast cover | The preamble is limiting and should be construed as: "An LED lighting apparatus for installation in an existing light fixture having a ballast cover" |
| 29 | A method for retrofitting a light fixture with an energy-efficient lighting apparatus, the light fixture having a ballast cover | The preamble is limiting and should be construed as: "A method for installing an LED lighting apparatus in an existing light fixture having a ballast cover" |
| 12 | the circuit board is positioned adjacent the housing | "the circuit board is positioned close to or near the housing" |
| 29 | positioning the circuit board adjacent the housing | "positioning the circuit board close to or near the housing" |

| Claim(s) | Term/Phrase | Agreed Construction |
|---|---|---|
| 12 | fastening mechanism for securing the attachment surface of the lighting apparatus to the illumination surface | The parties dispute whether this is a means-plus-function clause under Section 112, ¶ 6. To the extent it is found not to be a means-plus-function clause, the parties agree that the term should be construed as follows: "a mechanism that attaches the attachment surface to the illumination surface, directly or indirectly." |
| 29 | securing the attachment surface of the housing to the illumination surface | "attaching the attachment surface to the illumination surface, directly or indirectly" |
| 12 & 29 | Coupled | "electrically connected, directly or indirectly" |

## VI.  DISPUTED CONSTRUCTIONS

### A.    "HOUSING"

#### 1.    Plaintiff's Opening Position

| Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "housing" | "portion of lighting apparatus that covers or protects other components" | "a structure that encloses other components" |

The parties' primary disputes with respect to this term is (1) whether the term should be construed to reflect that the "housing" is a "portion of the lighting apparatus" (as Plaintiff proposes) or whether it should be construed to require "a structure" (as Defendants propose) and (2) whether the term should be construed to reflect that the "housing" "covers or protects other components" (as Plaintiff proposes) or whether it should be construed to require that the "housing" "enclose[] other components" (as Defendants propose).

With respect to the first dispute, the plain language of the claims and specification demonstrate that "housing" should be construed to reflect that it is part of the lighting apparatus. The claims recite "[a]n energy-efficient lighting apparatus for retrofit with an existing light fixture having a ballast cover, comprising: a housing." (A013 ('747 patent) at 11:26-28 (claim 12); 12:51-54 (claim 29) ("A method for retrofitting a light fixture with an energy-efficient lighting apparatus, the light fixture having a ballast cover, the method comprising: providing a housing").) Thus, the plain language of the claims specifies that the "housing" constitutes part of the "lighting apparatus." As the specification makes clear, in this art, there can be many different types of housings, such as housings that are part of the light fixture, as opposed to the lighting apparatus. (*See, e.g.*, *id*. at A008 at 1:33-35 ("A typical fluorescent light fixture has an elongated housing, usually made of metal or plastic with a downwardly opening elongated cavity….").) Thus, it will reduce potential confusion among jurors if "housing" is construed to reflect how it is used in the claims: as part of the lighting apparatus that fits into an existing light fixture.

Conversely, there is no support in the claims or specification for requiring the housing to be a separate "structure," as Defendants propose. The term "structure" is not used in the claims or specification to refer to the "housing" or in any other context. Moreover, as both parties' proposed constructions make clear, the "surfaces" that are included in the housing—the "attachment surface" and the "illumination surface"—are "layers." (A019 (Joint Claim Construction Chart).) "A structure" connotes something that may be more physically substantial than a layer, which could, for example, simply be a layer of paint. In this way, Defendants' proposed construction is also inconsistent with the parties agreed constructions for "attachment surface" and "illumination surface."

With respect to the second dispute, the plain language of the claims and specification demonstrate that the term should be construed to reflect that the "housing" "covers or protects other components." Both sides agree that "housing" should be construed, at least in part, in terms of its relationship to other components. Plaintiff proposes that "housing" should be construed to mean something "that covers or protects other components," while Defendants contend that "housing" should be construed to mean something "that encloses other components." However, Plaintiff's proposed construction better reflects the plain meaning of the term "housing," as it is used in the context of the invention. The claims make clear the "illumination surface" component of the housing *covers* the circuit board, to some degree, because the claims specify that the LEDs mounted on the circuit board protrude through holes in the illumination surface. (A013 ('747 patent) at 11:32-36 (claim 12) ("a circuit board comprising a plurality of light-emitting diodes, wherein the circuit board is positioned adjacent the housing so that the plurality of light-emitting diodes protrude through the plurality of illumination surface holes in the illumination surface"); *see also id.* at 12:59-64 (claim 29).) In addition, Plaintiff's proposed construction is more consistent with the plain meaning of the term "housing." (A162 (The American Heritage Dictionary of the English Language (2000) ("Am. Heritage Dictionary")) ("Something that covers, protects, or supports….").)

In contrast, there is no support in the claims for requiring that the housing "enclose" other components. The claims do not require enclosure, and the portions of the specification to which Defendants point in their disclosure of intrinsic evidence (A018 (Joint Claim Construction Chart)) do not specify that the housing must "enclose" other components in the lighting apparatus. Defendants point, in particular, to Figure 5 (reproduced above at 5), specifically the structure identified as 528, which is the housing. (A012 ('747 patent) at 9:11.) Figure 5 depicts

11

the circuit board (the component labelled 511 (*id*. at 9:30-31)) adjacent to certain portions of the housing.  However, even if it showed the housing enclosing the circuit board, which is, at best, ambiguous from the cross-section depicted in Fig. 5, the claims should not be limited based on a disclosed embodiment.  *See Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009) ("The patentee is entitled to the full scope of his claims, and we will not limit him to his preferred embodiment or import a limitation from the specification into the claims.").  That is particularly true where, as here, the specification makes clear that the figures "depict only typical embodiments and are, therefore, not to be considered limiting the invention's scope."  (A009 ('747 patent) at 3:56-58; 4:18-32.)

Accordingly, this term should be construed to mean "portion of lighting apparatus that covers or protects other components," and Defendants' attempt to import "structure" and "enclose" from a disclosed embodiment should be rejected.

## 2.    Defendants' Answering Position

The parties' first dispute is whether the term "housing" should be construed to be a structure consistent with the specification and the plain and ordinary meaning of the term (Defendants' position), or whether the term should be construed so broadly as to include — without specification support — a layer of paint (Blackbird's position).

Defendants' proposed construction is consistent with the plain and ordinary meaning of the term "housing," a commonplace structural term.  *See, e.g.*, *Kenall Mfg. Co. v. H.E. Williams, Inc.*, No. 09 C 1284, 2013 WL 427119, at *8 (N.D. Ill. Feb. 1, 2013) ("A 'housing,' therefore, is a structure that supports or contains lighting fixture components"); *Compressor Prod. Int'l LLC v. Graco, Inc.*, No. CIV.A. H-12-3008, 2013 WL 6865541, at *8 (S.D. Tex. Nov. 19, 2013) ("The parties do not dispute that the "pump housing" is a structure…").

Defendants' proposed construction of "housing" to mean "a structure" is also consistent with the meaning and usage of this term in the '747 patent claims, specification, and prosecution history.  In contrast, Blackbird's proposed construction expands the term in a manner not supported by the intrinsic record to the point where it practically reads this limitation out of the claim.  Blackbird asserts, without pointing to any support in the intrinsic record, that even a layer of paint could be a "housing" within the meaning of the claim.  (*Supra* at 10.)

For example, claim 12 requires a housing to be a structure because the housing must have two different surfaces.  (*See* A012 ('747 patent) at 11:28-29 ("a housing having an attachment surface and an illumination surface").)  Claim 12 further describes that a circuit board is adjacent to the housing and has LEDs that protrude through holes in the illumination surface — a layer of paint cannot have two distinct surfaces sufficient to meet this requirement.  (*See* A012 ('747 patent) at 9:32-36 ("a circuit board . . . wherein the circuit board is positioned adjacent the housing so that the plurality of light-emitting diodes protrude through the plurality of illumination surface holes in the illumination surface").)  Further, claim 29 recites "providing a housing" as a step in retrofitting a light fixture, thereby connoting that the housing is a separate structure that is incorporated into the light fixture.  (A013 ('747 patent) at 12:51-54.)

The specification also supports Defendants' construction, explaining, for example, that the housing "is dimensioned so that it may be installed to an existing ballast cover."  (A012 ('747 patent) at 9:15-16; *see also* A009 ('747 patent) at 3:38-48; A012 ('747 patent) at 9:11-35.)  This description is consistent with Defendants' proposed construction because only a structure may be sized to for installation with an existing ballast cover, but a layer of paint can neither be sized nor "installed."

Blackbird's efforts to frame the parties' disagreement over whether a "housing" requires a structure is misleading because Blackbird's proposed construction would permit a "housing" to be just a "portion of lighting apparatus," essentially removing any physical significance to this term.  Because claim 12 is directed to a "lighting apparatus" as a whole and claim 29 is directed to a method for retrofitting a light fixture with a "lighting apparatus," it is clear that all of the components of the "lighting apparatus" recited in these claims are structural parts of the lighting apparatus.  Blackbird, however, ignores the structural significance that the Applicants assigned to the "housing" in the claims and specification, and instead would permit ***anything*** (even a layer of paint) within the accused products to be called a "housing," so long as it "covers" or "protects" some other components.  Blackbird's attempt to read the structural term "housing" out of the claim should be rejected.  *Randall May Int'l, Inc. v. DEG Music Prod., Inc.*, 378 F. App'x 989, 998 (Fed. Cir. 2010) ("The district court's elision of the claim limitation … is legal error because all the limitations in a claim must be considered meaningful.").

The parties further dispute whether the "housing" must "enclose other components" (Defendants' proposal) or "cover or protect other components" (Blackbird's proposal).  Defendants' construction requiring that the "housing" "encloses other components" accurately reflects the consistent description of this term in the specification.  (*See* A007 ('747 patent), Figure 5) (showing the circuit board, on which a plurality of light-emitting diodes ("LEDs") are mounted, enclosed in the housing); A012 ('747 patent) at 9:26-35 (noting that Figure 5 shows a "cut away" of a section of the housing "in order to expose circuit board 511" which "may be positioned either partially or wholly inside the housing 528").)

Blackbird cites no specification support for its allegation that "housing" should be construed to "protect" other components.  Further, Blackbird's reliance on an extrinsic dictionary

definition of "housing" is misleading, because Blackbird omits the portion of the cited definition that makes clear that a "housing" is a structure, such as a frame or bracket, rather than something less substantial like a layer of paint.  *Compare* A162 (The American Heritage Dictionary of the English Language (2000)) ("Something that covers, protects, or supports, especially: A frame, bracket or box for holding or protecting a mechanical part") *with supra* at 11 (omitting "especially: A frame, bracket or box…").  Further, to the extent the Court decides that Blackbird's dictionary definition is not informative of the use of "housing" in the '747 patent, it is well established that a patentee cannot rely on such extrinsic definitions to avoid the teachings of the '747 patent's own specification and figures.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1319, 1321 (Fed. Cir. 2005) ("[E]xtrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence;" "[H]eavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification.").

Contrary to Blackbird's argument, Defendants' construction is not unduly narrow due to the requirement that a "housing" "encloses other components" (*Supra* at 11.)  In fact, Defendants' construction does not specify which of the components must be enclosed, as specifying such components could be an example of trying to narrow the claims to just the disclosed embodiments.  Instead, Defendants merely rely on the disclosure of the specification and the claims, from which it is clear that the "housing" always "encloses" some other components, such as the attachment surface or circuit board.  (A007 ('747 patent), Figure 5; A009 ('747 patent) at 3:38-48; A012 ('747 patent) at 9:11-35.)

There is no support in the intrinsic record for Blackbird's attempt to expand "housing" to be any "portion of lighting apparatus that covers or protects other components," which — according to Blackbird — may be something as insubstantial as "a layer of paint." (*Supra* at 10.) In arguing for its impermissibly broad definition, Blackbird attempts to impute the definitions of "attachment surface" and "illumination surface," which both parties define as "layers," to the term "housing." (*Supra* at 10.) But this argument is flawed because it attempts to equate the housing — a dimensioned structure — with its surfaces. (*See* A013 ('747 patent) at 11:28-29 (claim 12) ("a housing *having* an attachment surface and an illumination surface") (emphasis added) and 12:54-55 ("providing a housing *having* an attachment surface and an illumination surface") (emphasis added). Moreover, that certain surfaces may be included within or as part of the housing does not diminish the propriety of Defendants' proposal. The specification shows that the "attachment surface" and "illumination surface" are surfaces that are part of a larger structural piece — the "housing" — which is consistent with Defendants' proposed construction. (*See* A007 ('747 patent), Figure 5; A009 ('747 patent) at 3:38-48; A012 ('747 patent) at 9:11-35.)

Thus, in view of the intrinsic record, the proper construction of "housing" is "a structure that encloses other components" as proposed by Defendants.

### 3. Plaintiff's Reply Position

Because Defendants' Answering Position clarified that the "encloses" portion of Defendants' proposed construction is not limiting with regard to "which of the components must be enclosed" (*supra* 15), Plaintiff does not object to construing "housing" to reflect that it "encloses" other components.[2] Thus, the key dispute remaining is whether "housing" is required

---

[2] After receiving Defendants' Answering Claim Construction Brief, Plaintiff proposed a compromise construction to Defendants for this term: "an enclosure that covers or protects other

to be "a structure" or whether it should be construed to be part of the lighting apparatus that "covers or protects other components."[3]  In the context of the '747 patent, it is clear that a "housing" need not be "a structure."

Defendants' primary argument in favor of their proposed construction is an attack on a strawman version of Plaintiff's opening position.  Defendants claim that Plaintiff argues that "a layer of paint could be a 'housing' within the meaning of the claim" (*supra* 13), and then explain at length why that is not so.  But what Plaintiff actually argued—in a passage never quoted in full by Defendants, despite seven separate references to it—was that Defendants' contention that the "housing" must be "a structure" was inconsistent with the agreed portions of the parties' proposed constructions for two of the housing's surfaces.  Specifically, that it was inconsistent with the agreed constructions for "attachment surface" and the "illumination surface," *i.e.*, the only two components of the housing described in the asserted claim.  The parties agreed that at least these surfaces of the "housing" were "layers" (A019 (Joint Claim Construction Chart)), and, as Plaintiff argued, a "***layer***" could be something as non-structural as paint.  (*Supra* 10.)

Defendants do not dispute that such a "layer" could be paint, only that the "housing" should not be "equate[d]…with its surfaces.  (*Supra* 16.)  However, the claim makes clear that the only two specified elements of the housing are these two surfaces.  (A013 ('747 patent) at 11:28-29 (claim 12) ("a housing having an attachment surface and an illumination surface").)  The claim does not require that the "housing" be a structure.  Of course, the "housing" could be a

components."  Defendants did not agree to Plaintiff's proposal.
[3] Plaintiff notes that Defendants raised no objection to the "covers" portion of Plaintiff's proposed construction in their Answering Position.

structure, so long as it had an "attachment surface" and an "illumination surface," but the claim does not require it, and such a requirement should not be read into the claim.[4]

Defendants point to claim language, but none specifies that the "housing" must be "a structure." Defendants assert, in particular, that "claim 12 requires a housing to be a structure because the housing must have two different surfaces." (*Supra* 13.) But the mere fact that something has two surfaces does not mean that it is "a structure." Defendants also point to a passage in the specification discussing Figure 5, which is an "embodiment of a lighting apparatus" (A012 ('747 patent) at 9:1-2), that states "that the housing 'is dimensioned so that it may be installed to an existing ballast cover.'" (*Supra* 13 (quoting (A012 ('747 patent) at 9:15-16).) However, that something has "dimensions" does not mean that it is a structure. Every physical thing has dimensions.

Defendants maintain that Plaintiff misleadingly omitted part of a dictionary "definition [that] makes clear that a 'housing' is a structure, such as a frame or bracket...." (*Supra* 15.) Plaintiff does not dispute that a "frame" or "bracket" could be a housing in a general sense, but that is not the issue before the Court. Rather, the issue is whether, in the context of the '747 patent, the "housing" is required to be "a structure." It is not. Similarly, Defendants point to other district court decisions in which the courts adopted agreed-upon, in relevant part, constructions of "housing" as "a structure." (*Supra* 12.) But, as the Federal Circuit noted in *Eon Corp.*, on which Defendants rely (*infra* 50), "[t]he only meaning that matters in claim

---

[4] Relying on *Randall*, Defendants assert that Plaintiff's construction would "read the structural term 'housing' out of the claim." (*Supra* 14.) Plaintiff's construction would not read "housing" out of the claim, but, rather, define "housing" in a manner consistent with the claim. This is unlike the facts of *Randall*, where the district court gave no effect to adjectives that modified a claim term. 378 F. App'x at 997 (holding that modifiers "'changeable' or 'adjustable'" must be construed to modify the terms immediately following). Here, the term is "housing" not, as Defendants would have it, a "structural housing."

construction is the meaning in the context of the patent." *Eon*, 815 F.3d at 1321.  In the context

of this patent, it is clear that the "housing" has the two specified surfaces and is part of the

lighting apparatus, consistent with Plaintiff's proposed construction.

### 4.     Defendants' Sur-Reply Position

Blackbird concedes that Defendants' construction requiring the housing to "enclose"

other components is correct, and now only disputes whether a "housing" must be a structure.

(*Supra* at 16-17.)  However, Blackbird's argument that a "housing" is not a structure would

impermissibly render the term "housing" meaningless.[5]  In support of its construction ("a portion

of the lighting apparatus…"), Blackbird incorrectly argues that the intrinsic record provides no

information about the housing other than that the housing comprises an attachment surface and

an illumination surface.  (*Supra* at 17.)  Blackbird then concentrates on its incorrect allegation

that under the parties' agreed portions of the constructions of "attachment surface" and

"illumination surface," each "surface" of the housing "could be something as non-structural as

paint."  (*Id*.)  Such an interpretation is contrary to the claims and, tellingly, Blackbird provides no

intrinsic evidence supporting its position.

Claim 29 provides compelling evidence that "housing" should be construed to require

structure because it requires the "housing" to be a separate structure that has to be incorporated

---

[5]  Blackbird proposed "an enclosure that covers or protects other components" as a compromise
construction for this term.  Defendants did not agree to Blackbird's proposed compromise
construction because it does not resolve the dispute between the parties and is contrary to the
specification because it would permit a non-structural component, such as a layer of paint, to be
a "housing."

into the light fixture.  (A013 ('747 patent) at 12:51-54).[6]  Claim 29 makes clear that the claimed

"housing" is not some amorphous "portion of the lighting apparatus," but rather the "housing" is

an independent and discrete structure that has to be *added* to the lighting fixture.

Blackbird's argument that the "housing" could be any "portion of the lighting apparatus"

and not a distinct structural element also is contrary to the specification, which teaches that the

housing has to be "*dimensioned* so that it may be *installed* to an existing ballast cover."  (A012

('747 patent) at 9:15-16 (emphasis added)).  Blackbird's argument that "every physical thing has

dimensions" misses the point.  (*Supra* at 18.)  Although a layer of paint might have dimensions, a

layer of paint cannot be "dimensioned" because it is not structural.  Further, a layer of paint

cannot be "installed" into an existing ballast cover because it is not a structure.  The ordinary

usage of "dimensioned" and "installed" only makes sense in the context of a structure, and does

not apply to a layer of paint.

Blackbird also misses the point of Defendants' citation to the full dictionary definition of

"housing" cited in Blackbird's Opening Position.  (*Supra* at 11, 15.)  Defendants do not contend

that a "frame" or "bracket" should serve as the "housing" in the '747 patent, but rather that all of

the examples listed in that dictionary definition are structural, further supporting Defendants'

position that "housing" must be a "structure."  (*Supra* at 14-15.)  The structural nature of

"housing" is a central feature of the alleged invention claimed in claim 12.

---

[6]  Following receipt of Defendants' Responsive Claim Construction Brief ("Defs.' Response")
and the filing of Defendant PlusRite USA Corp.'s letter requesting leave to file an early summary
judgment motion, Blackbird announced its intention to drop its assertions of infringement of
claim 29 against all Defendants.  This belated move by Blackbird has no effect on the proper
construction of the disputed terms because a term appearing in multiple claims in the same patent
must have the same meaning in every claim.  *See, e.g., Felix v. Am. Honda Motor Co.*, 562 F.3d
1167, 1178 (Fed. Cir. 2009); *Georgia-Pacific Corp. v. U.S. Gypsum Co.*, 195 F.3d 1322, 1331
(Fed. Cir. 1999).

### B.   "ATTACHMENT SURFACE"

#### 1.   Plaintiff's Opening Position

| Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "attachment surface" | "layer of the housing to which the illumination surface is secured" | "the layer of the housing that is secured to the ballast cover and to which the illumination surface is secured" |

The parties' only dispute with respect to the term "attachment surface" is whether the "attachment surface" must be "secured to the ballast cover" (as Defendants propose).  None of the claims, specification, and prosecution history require or support such a construction.  Rather, consistent with Plaintiff's proposed construction, the term "attachment surface" should be construed to mean a "layer of the housing to which the illumination surface is secured."

*First*, claims 12 and 29 do not contain any requirement that the attachment surface be secured to the ballast cover.  Instead, the claims require only that the attachment surface be secured to the illumination surface, as reflected in both parties' proposed constructions.  Specifically, the claims recite a "fastening mechanism for securing the attachment surface of the lighting apparatus *to the illumination surface*...."  (A013 ('747 patent) at 11:37-39 (claim 12)[7]; 12:63-64 (claim 29) ("securing the attachment surface of the lighting apparatus *to the illumination surface*").)  There is no language in either of claims 12 or 29 that even hints at the attachment surface being secured to a ballast cover.  Accordingly, the plain language of the claims weighs strongly in favor of Plaintiff's proposed construction and against Defendants'.  *Dana Corp. v. Am. Axle & Mfg., Inc.*, 110 F. App'x 871, 876 (Fed. Cir. 2004) ("[T]he claim construction inquiry...begins and ends in all cases with the actual words of the claim." (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998)).

---

[7] All emphasis herein is added unless otherwise noted.

*Second*, there is no support in the specification for reading a requirement that the attachment surface be secured to the ballast cover into claims 12 and 29.  Defendants appear to base their argument on the discussion of Figure 5 of the '747 patent (below), which describes the attachment surface (element 530) secured to a ballast cover, which is not shown in the figure (A012 ('747 patent) at 9:7-10).  (*See* A019 (Joint Claim Construction Chart).)



**Fig. 5**

However, the specification does not support Defendants' efforts to import this limitation.

As discussed above with respect to Defendants' proposed construction of "housing," it is improper to limit claims based on disclosed embodiments, *Kara Tech.*, 582 F.3d at 1348, particularly where the specification makes clear that the figures are not limiting (A009 ('747 patent) at 3:56-58; 4:18-32).  Moreover, in discussing Figure 5 specifically, the specification states that "*[i]n the illustrated embodiment*, the lighting apparatus 500 *is configured to be secured to the ballast cover* (not shown) within a light fixture."  (A012 ('747 patent) at 9:7-10.)  This emphasizes that the attachment cover's being secured to the ballast cover is a particular configuration that this embodiment depicts; not an element that necessarily must be present in the claims.  Further, in continuing to describe this embodiment, the specification explains that "*[i]n typical operation*, the attachment surface 530 is secured to the ballast cover."  (*Id*. at 9:16-19.)  That such attachment is "typical" means that it is not required.  *See i4i Ltd. Partn. v.*

22

*Microsoft Corp.*, 598 F.3d 831, 844 (Fed. Cir. 2010), *aff'd,* 564 U.S. 91 (2011) ("The specification's permissive language [regarding what the claimed invention could do]…does not clearly disclaim systems lacking these benefits.").  Taken together, Defendants propose a construction that imports a ***non-required*** feature of a ***particular embodiment*** into claims that contain no language to support such a construction.  A skilled artisan reading these specification disclosures would understand, in light of the plain language of claims 12 and 29, that the "attachment surface" need not be secured to the ballast cover, and there is no reason to construe those claims otherwise.

*Third*, Defendants' proposed construction directly conflicts with the prosecution history of the '747 patent.  Claim 12 originally required "a fastening mechanism for securing the attachment surface of the lighting apparatus ***to the ballast cover,***" and, similarly, claim 29 required "securing the attachment surface of the housing ***to the ballast cover***" (A054, A057 (October 6, 2005 Amendment and Response to Office Action).)  Thus, the claims originally required securing the attachment surface to the ballast cover, just as Defendants now propose. However, an Examiner's Amendment ***deleted*** "ballast cover" in the relevant part of each claim and replaced it with "illumination surface."  (A038 (January 13, 2006 Examiner's Amendment).) This change, which the Applicant authorized (*id*.), makes clear that the inventors did not believe the attachment surface must be secured to the ballast cover, in the contexts of claims 12 and 29, but was instead secured to the illumination surface.  *Phillips*, 415 F.3d at 1317 ("[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention ….").)  Defendants' proposed construction would undo this Amendment, which put the claims in condition for allowance.  (A037 (Notice of Allowability); A040 (Examiner-Initiated Interview Summary).)  Such a construction is improper.

*See Bd. of Regents of the U. of Texas System v. BENQ Am. Corp.*, 533 F.3d 1362, 1369 (Fed. Cir. 2008) ("[T]he prosecution history may be given substantial weight in construing a term where that term was added by amendment." (quoting *Philips*, 415 F.3d at 1317)).  A skilled artisan reviewing the prosecution history would view it as confirming that, consistent with the plain language of the claims and the disclosure of the specification, claims 12 and 29 do not require that the attachment surface be secured to the ballast cover.

Accordingly, "attachment surface" in claims 12 and 29 should be construed to mean the "layer of the housing to which the illumination surface is secured," and Defendants' attempt to read a requirement that the attachment surface be secured to a ballast cover should be rejected.

## 2.    Defendants' Answering Position

As written, Claims 12 and 29 of the '747 patent are invalid for lack of written description, because nowhere in the specification or figures is there any disclosure that the attachment surface is secured to the illumination surface, as discussed in detail in Defendants' Motion to Dismiss (D.I. 9, 10 and 14 in C.A. No. 15-057-RGA).  *See* 35 U.S.C. § 112(a).  Rather, throughout the specification and figures, the attachment surface is disclosed as being secured to the ballast cover only.  However, at claim construction, the invalidity of these claims due to their failure to comply with the written description requirement is not at issue.  The question instead is how the Court should construe the disputed terms.

Defendants' proposed construction defines what an "attachment surface" is in view of the entirety of the intrinsic evidence, including the specification's disclosure that the purpose of the "attachment surface" is to serve as the surface of the housing that is secured to the ballast cover of the retrofitted lighting fixture for the provision of low level or emergency lighting.  (A009 ('747 patent) at 3:7-10; 3:11-13; 3:46-48; A012 ('747 Patent) 9:17-25; 9:36-40; 9:43-47.) Blackbird's proposed construction ignores the specification and instead attempts to clarify the

Examiner's Amendment made during prosecution of the asserted claims, which resulted in claims that — if read as Blackbird urges the Court to read them — impermissibly include subject matter beyond the '747 patent's disclosure.  *See* 35 U.S.C. § 132(a) ("No amendment shall introduce new matter into the disclosure of the invention.").

As issued, claims 12 and 29 include the limitation "securing the attachment surface … <u>to the illumination surface</u>."  The underlined language was introduced in a January 25, 2006 Examiner's Amendment that changed the original claim language that stated "securing the attachment surface … <u>to the ballast cover</u>."  (A038 (January 13, 2006 Examiner's Amendment).) Yet, the specification always described and continues to describe the attachment surface as only being secured to the ballast cover — there is no mention of the attachment surface being secured to the illumination surface.  (*See*, A009 ('747 patent) at 3:36-49; A012 ('747 patent) at 9:16-50; A013 ('747 patent), claims 12 and 29; and A007 ('747 patent), Figure 5.)

As the "Summary of the Invention" states, the alleged invention provides a method to retrofit lighting fixtures by securing the attachment surface of the housing of an LED lighting apparatus to the ballast cover of the lighting fixture being retrofitted. (A009 ('747 patent) at 3:36-49.)  Further, as the specification explains, the function of the attachment surface is to be the surface of the housing that is secured to the ballast cover, either directly or indirectly (A012 ('747 patent) at 9:16-50), by a "fastening mechanism" (*id*. at 9:36-39 ("The attachment surface 530 of the housing 528 includes a fastening mechanism 534.  The fastening mechanism 534 performs the function of securing the attachment surface 530 of the housing 528 to the ballast cover.")).  The "fastening mechanism" is also never described as connecting the illumination surface and the attachment surface.  The only description in the specification about the

relationship between the two surfaces is that the illumination surface is "opposite the attachment surface," not fastened to it.  (*Id*. at 9:19-20.)

Blackbird incorrectly argues that the two surfaces in the claims — the "illumination surface" and the "attachment surface" — have names that "reflect[] the surface's purpose in the lighting apparatus" and the "functions they perform."  (*infra* at 35, 37.)  The plain reading of these terms, in light of the specification, shows that the names were used to differentiate the two surfaces based on the side of the housing on which they are located, not to differentiate them based on what those surfaces do.  For instance, the "attachment surface" does not perform the function of attaching one thing to another — that is the function performed by the claimed "fastening mechanism."  (*See* A013 ('747 patent) at 11:37-39; *see also* A012 ('747 patent) at 9:36-39 ("The attachment surface 530 of the housing 528 includes a fastening mechanism 534. The fastening mechanism 534 performs the function of securing the attachment surface 530 of the housing 528 to the ballast cover.").)

The patentees could have named the two surfaces differently (*e.g.*, a "first" surface and a "second" surface), but the patentees chose to use the adjectives "illumination" and "attachment" as a way to differentiate the surfaces.  But the point of differentiation is their location relative to each other and the other elements of the claim, not their function.  (*See, e.g.*, A012 ('747 patent) at 9:16-20 ("The housing 528 includes an attachment surface 530 and an illumination surface 532.  …  The illumination surface 532 is opposite the attachment surface 530."); *see also* A009 ('747 patent) at 3:39-41; A013 ('747 patent) at 11:28-29 (Claim 12); A013 ("747 patent) at 12:54-55 (Claim 29); A007 ('747 patent), Figure 5 (showing the location of the "illumination surface" at 532 and the location of the "attachment surface" at 530).)

In view of the clear disclosure that the intended function of the attachment surface is to be secured to the ballast cover, and that the purpose of the attachment surface is to allow the attachment of the retrofitted LEDs to the existing lighting fixture by attaching the retrofitted housing to the ballast cover, the construction of the term "attachment surface" must acknowledge the requirement that the "attachment surface" attaches to the ballast cover.  Defendants' construction explicitly states this requirement, which would be apparent to a person of ordinary skill in the art reading the patent specification.  *See Phillips*, 415 F.3d at 1321 (a term is properly viewed as having the meaning that "the ordinary artisan after reading the entire patent" would ascribe to it.).  That the Examiner's Amendment introduced the requirement, found nowhere in the '747 patent specification, that the attachment surface be secured to the illumination surface, and not the ballast cover, does nothing to vitiate the propriety of including this clearly intended limitation in the claim.  *See Smith v. ORBCOMM, Inc.*, No. 2:14-CV-666, 2015 WL 5302815, at *12 (E.D. Tex. Sept. 10, 2015) (Gilstrap, J.) (holding patent claims invalid and rejecting patentee's argument that any indefiniteness was the result of an examiner error).

Contrary to Blackbird's insistence that Defendants are attempting to import a limitation from the specification to the claims (*supra* at 22-23), as discussed above, Defendants are simply proposing a construction that clarifies the meaning of "attachment surface" in view of how this term is used throughout the specification.

In view of the intrinsic record, the correct construction of the term "attachment surface" is "the layer of the housing that is secured to the ballast cover and to which the illumination surface is secured."

### 3.     Plaintiff's Reply Position

In support of their attempt to read a limitation into the asserted claim requiring that the "attachment surface" be secured to "the ballast cover," Defendants offer three arguments.[8]  Each is unavailing.

***First***, Defendants contend that "the entirety of the intrinsic evidence" requires that "attachment surface" be construed to require that it be secured to "the ballast cover."  (*Supra* 24.)  Defendants, however, ignore the plain language of the claim and focus entirely on certain passages in the specification, almost none of which were disclosed in Defendants' list of intrinsic evidence in the Joint Claim Construction Chart.  (A019 (Joint Claim Chart).)  But, even if the specification said what Defendants contend it does, it cannot override the plain language of the claim.  Furthermore, contrary to Defendants' assertions, the specification does not require that the "attachment surface" of claim 12 be secured to "the ballast cover."

The plain language of the asserted claim does not, in any way, suggest that the "attachment surface" must be secured to "the ballast cover," a point Defendants do not dispute.  The claim recites only a "fastening mechanism for securing the attachment surface of the lighting apparatus ***to the illumination surface***…."  (A013 ('747 patent) at 11:37-39 (claim 12).)  When claim language is as clear as it is here, the Federal Circuit has emphasized that importing limitations from the specification into claims is especially disfavored.  *Straight Path IP Group, Inc. v. Sipnet EU S.R.O.*, 806 F.3d 1356, 1361 (Fed. Cir. 2015) ("When claim language has as plain a meaning on an issue…, leaving no genuine uncertainties on interpretive questions relevant to the case, it is particularly difficult to conclude that the specification reasonably

---

[8] Defendants also state that Plaintiff "incorrectly argues that the two surfaces in the claim—the 'illumination surface' and the 'attachment surface'— have names that 'reflect[] the surface's purpose in the lighting apparatus' and the 'functions they perform.'"  (*Supra* 26.)  Plaintiff made this argument in the section addressing the construction for "illumination surface."  (*Infra* 35.)  It has no bearing on the dispute with respect to "attachment surface."

supports a different meaning."); *U.S. Ethernet Innovations, LLC v. Acer, Inc.*, 646 F. App'x. 929, 933–34 (Fed. Cir. 2016) ("The statements in the specification…purporting to define the invention are inapposite without language in the claims indicating a desire to claim the teachings disclosed.").

Furthermore, the specification passages relied on by Defendants do not support the assertion that the exclusive "purpose" of the "attachment surface" is to be secured to the ballast cover.  Defendants rely in particular on Figure 5 and the specification's accompanying discussion of it.  (*Supra* 24-26.)  However, as Plaintiff noted in its Opening Position, Figure 5 is an "embodiment" of the invention."  (A012 ('747 patent) at 9:1-2.)  Defendants offer no justification for limiting claim 12 based on a disclosed embodiment.

Significantly, Defendants fail to address the fact that, in describing the embodiment depicted in Figure 5, the specification states that "*[i]n typical operation*, the attachment surface 530 is secured to the ballast cover."  (A012 ('747 patent) at 9:16-19.)  Thus, even in this embodiment, such securing is not required.  Moreover, although Defendants attempt to cast securing the "attachment surface" to "the ballast cover" as the key element of the invention, the embodiment on which they primarily rely does not even depict a "ballast cover."  (A012 ('747 patent) at 9:7-10 (noting that "the ballast cover" is "*not shown*" in Figure 5.)  Such treatment of "the ballast cover" hardly reflects its supposedly fundamental nature.

The remaining passages of the specification on which Defendants rely (*supra* 24) also fail to support Defendants' argument.  Defendants do not point to any disclosure in the specification that requires that the "attachment" surface be secured to "the ballast cover," and there is no such disclosure.  To the contrary, even certain of the passages on which Defendants seek to rely emphasize that the "attachment surface" need not necessarily be secured to "the ballast cover."

(*Supra* 24 (citing A009 ('747 patent) at 3:11-13 ("The lighting apparatus **may also include** a connector in the attachment surface of the housing that snaps into a ballast cover hole in the ballast cover.").)  Accordingly, the disclosures of the specification do not come close to justifying departing from the plain language of the claim.

> **Second**, Defendants assert, without explanation, that Plaintiff's construction somehow "attempts to clarify the Examiner's Amendment" and argue that the Court can ignore the effect of the Examiner's Amendment in construing the claim.  (*Supra* 24-25, 27.)  Defendants are wrong.

> The Amendment was unambiguous and requires no clarification.  By removing the claim language specifying that the "attachment surface" is secured to "the ballast cover" and replacing it with language specifying that the "attachment surface" is secured to the "illumination surface," the Examiner's Amendment leaves no doubt what the claim language requires.  Plaintiff's proposed construction is consistent with the effect of the Amendment, and Defendants' proposed construction is directly contrary to it.

> Defendants contend that the Examiner's Amendment "does nothing to vitiate the propriety of including this clearly intended limitation [*i.e.*, that the 'attachment surface' be fastened to the ballast cover], in the claim."  (*Supra* 27.)  But that is exactly what the Amendment does.  If the applicants had "clearly intended" that the "attachment surface" recited in claim 12 necessarily be secured to "the ballast cover," they could have rejected the proposed Examiner's Amendment and retained the original claim language.  Instead, they consented to the Examiner's Amendment changing the relevant language.  That is dispositive of this issue.

> The lone case Defendants offer in support of their argument, *Smith v. ORBCOMM, Inc.*, 2015 WL 5302815 (E.D. Tex. Sept. 10, 2015), is inapposite.  *Smith* involved claims that were

held invalid as indefinite. *Id*. at *12. The plaintiff in *Smith* argued that the claims contained obvious typographical errors that created the validity issues and requested that the district court correct the errors through claim construction, which the court declined to do. *Id*. Here, no party asserts that the Examiner's Amendment introduced an obvious error, and, regardless, Defendants have not even attempted to show that the standard for correction through claim construction is met.

Further intrinsic evidence contradicts Defendants' story. The prosecution history makes clear that the amendment in question was made "to resolve 112 issues." (A038 (Detailed Action: Examiner's Amendment).) The examiner, focusing on precisely the claim language at issue now, determined that the amended language put claim 12 in better position for allowance. Defendants' assertion that the Examiner's Amendment did exactly the opposite—that it created a written description violation that the Court must now "correct"—has no basis in the record, and defies logic.

***Third***, Defendants suggest that Plaintiff's proposed construction would render the claim invalid for lack of written description support. (*Supra* 3, 24.) Compliance with the written description requirement is a question of fact, which is analyzed from the perspective of one skilled in the art. *Tobinick v. Olmarker*, 753 F.3d 1220, 1226 (Fed. Cir. 2014). Accordingly, it would be inappropriate to adjudicate this issue during claim construction. The Federal Circuit has made clear that courts should first construe claims and only then determine whether there is written description support for the claims as properly construed. *Koninklijke Philips Elecs. N.Y. v. Cardiac Sci. Operating Co.*, 590 F.3d 1326, 1336 (Fed. Cir. 2010) ("A district court must base its analysis of written description under § 112 on proper claim construction.... On remand, the district court must construe [the disputed claims] in light of the…written description ***and then***

31

***determine*** whether the [predecessor] application's written description satisfies § 112...."). Defendants effectively concede this point, acknowledging that their defense "is not at issue" (*supra* 24), notwithstanding that they repeatedly raise it. Nevertheless, because Defendants have made this issue a centerpiece of their Answering Position, Plaintiff will briefly address it.

As an initial matter, although Defendants state that there is no written description support for securing the "attachment surface" to the "illumination surface" (*supra* 24), Defendants ignore that both parties' proposed constructions include such a requirement. Thus, regardless of whether that requirement raises a written description issue—which it does not—that portion of the construction is agreed.

In any event, a skilled artisan would understand that the inventors possessed the inventions of claim 12. For example, a skilled artisan examining Figure 5 would see that the "attachment surface" was secured to the "illumination surface." Defendants contend that the specification only explicitly discusses the "attachment surface" being secured to "the ballast cover." (*Supra* 24-25.) But, as is evident in light of Defendants' proposed construction for "attachment surface," which requires attachment to both "the ballast cover" and the "illumination surface," nothing prevents the "attachment surface" from being secured to more than one surface.[9] More to the point, the issue is not what the textual description accompanying Figure 5 expressly discusses. It is, instead, whether a skilled artisan studying Figure 5—which shows the "illumination surface" and the "attachment surface" connected together by what Plaintiff's annotations point to as a "fastening mechanism" (*infra* 64)—would believe that "the inventor[s]

---

[9] Defendants' assertions that Plaintiff's "misidentifie[d] the 'fastening mechanism'" in its annotations of this figure in its Opening Position (*supra* 7-8, *infra* 70 n.21) are wrong. Figure 5 discloses the use of adhesive strips as a "fastening mechanism," however, a skilled artisan reviewing the Figure would understand that the disclosure is not so limited.

possessed" a lighting apparatus in which the "illumination surface" and "attachment surface" were secured to one another.  He plainly would.

Accordingly, "attachment surface" in claim 12 should be construed to mean the "layer of the housing to which the illumination surface is secured," and Defendants' attempt to read in a requirement that the attachment surface be secured to a ballast cover should be rejected.

### 4.     Defendants' Sur-Reply Position

In its Reply, Blackbird relies heavily on what it claims is the "plain language" of "attachment surface."  But claim terms cannot be construed in a vacuum — the intrinsic evidence must be considered, as Defendants have done.  *See Phillips v. AWH Corp.*, 415 F.3d. 1301, 1316 (Fed. Cir. 2005).

As an initial matter, Blackbird does not cite any language in the specification to support its proposed construction.  Nor could it.  As described in Defendants' Response, the specification discusses securing the attachment surface to only the ballast cover and not to the illumination surface.  (*Supra* at 25.)  A person of ordinary skill in the art would understand the patent to require the "attachment surface" to enable the attachment of the lighting apparatus to the ballast cover.

Blackbird places undue emphasis on the change from "to the ballast cover" to "to the illumination surface" that was introduced by the Examiner's Amendment.  Although the Amendment might have altered the claim such that the attachment surface must be secured to the illumination surface, this does not change the fact that, throughout the specification, Applicants describe the attachment surface as being the surface of the housing that is secured to the ballast cover.  (*See, e.g.*, A012 ('747 patent) at 9:16-50).  In other words, the Examiner's Amendment cannot be read as changing the claim to read "a fastening mechanism for securing the attachment surface of the lighting apparatus to the illumination surface, ***but not necessarily the ballast***

33

*cover*" (emphasis added).  Indeed, Blackbird admits that "nothing prevents the 'attachment surface' from being secured to more than one surface." (*Supra* at 32.)

The only embodiment of the retrofit apparatus of claim 12 requires that the attachment surface is secured to the ballast cover.  (*See, e.g.*, A008-9 ('747 patent) at 2:65-3:10).  Where the specification describes a feature as part of the invention, that feature becomes a part of the claim. *See Poly–America, L.P. v. API Indus., Inc.*, No. 16-1200, 2016 WL 5956745, at *4 (Fed. Cir. Oct. 14, 2016).  Moreover, such a claim construction is not, as Blackbird alleges, improperly importing limitations from the specification.  *See id.* ("Every embodiment described in the specification has [the feature] and every section of the specification indicates the importance [the feature]. These two facts provide together a proper reason to limit the claims in this way.").

It is also telling that Blackbird fails to identify any purpose for the attachment surface even though Blackbird's proposed construction of "illumination surface" includes language specifying that the purpose of that surface is "assists in lighting."  Blackbird cannot introduce a purpose only where it thinks that purpose is helpful to its infringement claims.

Finally, Blackbird's written description argument is unavailing.  As originally drafted, the '747 patent describes securing the attachment surface to the ballast cover.  (*See e.g.*, A012 ('747 patent) at 9:16-20 ("The housing 528 includes an attachment surface 530 and an illumination surface 532.  In typical operation, the attachment surface 530 is secured to the ballast cover.  The illumination surface 532 is opposite the attachment surface 530."))  There is no description of how the illumination surface is attached to the attachment surface.   Whatever the intent of the Examiner's Amendment was, it created more problems than it solved, because amending the claim but not the specification resulted in a written description deficiency that persists regardless

34

of which side's proposed construction for "attachment surface" is adopted.  Defendants'

proposed construction would clarify the meaning of "attachment surface" to include the intention

of the Applicants as expressed throughout the specification.

### C.      "ILLUMINATION SURFACE"

#### 1.      Plaintiff's Opening Position

| Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "illumination surface" | "layer of the housing covering the circuit board and which assists in lighting" | "the layer of the housing through which the light-emitting diodes protrude" |

The parties' primary dispute with respect to this term is whether it should be construed to

reflect that the "illumination surface" layer of the housing covers the circuit board and assists in

lighting (as Plaintiff proposes) or whether it should be construed to mean only the layer "through

which the light-emitting diodes protrude" (as Defendants propose).  The claims and specification

make clear that the term should be construed to mean "layer of the housing covering the circuit

board and which assists in lighting," as Plaintiff proposes.

Plaintiff's proposed construction is more consistent with the plain language of the

asserted claims.  The claims recite two housing surfaces: an "attachment surface" and an

"illumination surface."  (A013 ('747 patent) at 11:28-29 (claim 12); 12:54-55 (claim 29).)  The

claims could have been drafted to recite merely two "surfaces," but, instead, each surface was

given a name that reflects the surface's purpose in the lighting apparatus.  With respect to

"attachment surface," as both parties' proposed constructions reflect, that purpose is to be the

surface of the housing that is attached to another surface.  Similarly, "illumination surface"

should be construed in a manner that is consistent with and gives meaning to the "illumination"

modifier.  *Vederi, LLC v. Google, Inc.*, 744 F.3d 1376, 1383 (Fed. Cir. 2014) (rejecting

construction of "substantially elevations" because, *inter alia*, "[it] gives no effect to the 'substantially' modifier contained in the claims").  The name given the "***illumination*** surface" reflects that it is not merely a surface, but, rather, that it is a surface that assists in illumination. (*See* A163 (Am. Heritage Dictionary) ("illuminate" "To provide or brighten with light.").)

Conversely, Defendants' proposed construction is not consistent with the claims. Defendants' proposed construction specifies that the "illumination surface" is "the layer of the housing ***through which the light-emitting diodes protrude***," but other limitations in the asserted claims already explicitly recite that the LEDs protrude through the illumination surface.  (*See* A013 ('747 patent) at 11:33-36 (claim 12) ("wherein the circuit board is positioned adjacent the housing so that the ***plurality of light-emitting diodes protrude through the plurality of illumination surface holes in the illumination surface***"); 12:59-62 (claim 29) ("positioning the circuit board adjacent the housing so that the ***plurality of light-emitting diodes protrude through the plurality of illumination surface holes in the illumination surface***").)  Defendants' proposed construction of "illumination surface" would render these other limitations superfluous, since the fact that the LEDs protrude through the illumination surface "would be clear simply by using the term" "illumination surface."  *See Merck & Co., Inc. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.").  In comparison, under Plaintiff's proposed construction, the claims' explicit requirement that the LEDs protrude through the illumination surface holes in the illumination surface is not "excess verbiage."  *Id*. at 1372.

The specification also provides no support for Defendants' proposed construction.  For example, Defendants point to statements in the specification noting that the "method [disclosed in the '747 patent] involves providing a housing having an attachment surface and an

illumination surface" (A019 (Joint Claim Construction Chart) (citing '747 patent at 3:39-42)),

but this shows only that the '747 patent consistently refers to these surfaces in terms of the

functions they perform—attachment and illumination—and never merely as "surfaces." (*See*

*also id.* (citing '747 patent at 9:16-20 ("The housing 528 includes an ***attachment surface*** 530

and an ***illumination surface*** 532.  In typical operation….").)  This reinforces that Plaintiff's

proposed construction is consistent with the specification.

Accordingly, the "illumination surface" term should be construed, as Plaintiff proposes,

to mean "layer of the housing covering the circuit board and which assists in lighting."

### 2.    Defendants' Answering Position

The parties dispute whether the term "illumination surface" should be construed to

include two limitations, "assists in lighting" and "covering the circuit board," that are extraneous

to the language of the claims and lack support in the specification (Blackbird's position), or

should be construed consistently with the specification and other claim limitations (Defendants'

position).

Defendants' proposed construction is consistent with the claims, which require that the

LEDs protrude through the illumination surface, as Blackbird admits in its Opening Position.

(*See supra* at 36 ("other limitations in the asserted claims already explicitly recite that the LEDs

protrude through the illumination surface").)  Blackbird argues that Defendants' proposed

construction would render other limitations superfluous.  (*Id.*)  However, there is nothing

superfluous in Defendants' construction, because the claims require that the LEDs protrude

through "***illumination surface holes*** in the illumination surface," and not just the "illumination

surface" itself.  (A013 ('747 patent) at 11:34-36 (Claim 12) and 12:60-62 (Claim 29).)  By using

the word "illumination surface," the claims identify the surface at issue, *i.e.*, the side of the

housing through which the LEDs protrude to provide light.  Nothing in the '747 patent supports

Blackbird's assertion that the "illumination surface" "assists" with any function or does anything other than be the surface of the housing through which the LEDs protrude.

The impropriety of Blackbird's proposal is laid bare by the '747 patent itself where the words "assist" or "assists" are never used and there is no description of the "illumination surface" having any effect on the lighting capability of the alleged invention.  Indeed, this functional limitation in Blackbird's proposed construction should also be rejected because "assists" is a meaningless word; it does not explain what the assistance is or how the "illumination surface" provides such assistance.  Blackbird argues that the definition of "illuminate" — "[t]o provide or brighten with light" — somehow shows that the "illumination surface" "assists in illumination."  (*Supra* at 36.)  But neither the '747 patent nor Blackbird explain <u>how</u> the "illumination surface" provides this "assistance" or what the "assistance" is.[10] In the '747 patent, it is only the LEDs that illuminate, *i.e.*, "provide or brighten with light."  The "illumination surface" does not illuminate anything because it does not "provide or brighten with light."

Blackbird is incorrect that the name of the "illumination surface" and "attachment surface" "reflect[] the surface's purpose in the lighting apparatus" and the "functions they perform."  (*Supra* at 35, 37.)  As explained above, the "illumination surface" does not function to provide illumination — that is the function of the claimed light-emitting diodes ("LEDs").  (*See* A013 ('747 patent) at 11:40-42 and 12:65-67.)  It simply is not the case that the word "illumination" describes the function performed by the "illumination surface."

---

[10]  Blackbird does not and cannot assert that the "illumination surface" "assists" by being reflective or mirrored as there is no mention of any such characteristics in the specification of the '747 patent.

As explained in connection with the "attachment surface" in Section III.B., the point of differentiation between the "attachment surface" and "illumination surface" is their location, not their function.  (*See, e.g.*, A012 ('747 patent) at 9:16-20 ("The housing 528 includes an attachment surface 530 and an illumination surface 532. … The illumination surface 532 is opposite the attachment surface 530."); *see also* A009 ('747 patent) at 3:39-41; A013 ('747 patent) at 11:28-29 (claim 12); A013 ('747 patent) at 12:54-44 (claim 29); A007 ('747 patent), Figure 5 (showing the location of the "illumination surface" at 532 and the location of the "attachment surface" 530).)  Blackbird's attempts to suggest otherwise should be rejected.

Despite Blackbird's allegations (*supra* at 35-36), Defendants' construction is also consistent with and gives meaning to the word "illumination" because "illumination" identifies the surface that is being referred to, *i.e.*, the side through which the LEDs protrude for the LEDs to provide or brighten with light.

As discussed above, nothing in the '747 patent supports Blackbird's assertion that the "illumination surface" "assists" with anything or does anything other than be the surface of the housing through which the LEDs protrude.

In any event, there is no prohibition against two claim limitations stating the same characteristics of the claimed apparatus.  Indeed, different claim limitations can be construed to be consistent with each other and even to be identical.  *See, e.g.*, *SimpleAir, Inc. v. Sony Ericsson Mobile Commc'ns AB*, 820 F.3d 419, 429 (Fed. Cir. 2016) ("The preference for giving meaning to all terms, however, is not an inflexible rule that supersedes all other principles of claim construction.") (citing *Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1410 (Fed. Cir. 2004); *Power Mosfet*, 378 F.3d at 1410 ("[W]hile interpretations that render some portion of the claim language superfluous are disfavored, where neither the plain meaning nor the patent

itself commands a difference in scope between two terms, they may be construed identically.") (citing *Pickholtz v. Rainbow Techs., Inc.*, 284 F.3d 1365, 1373 (Fed. Cir. 2002)).

Further, Blackbird does not provide any support for including the phrase "covering the circuit board" in its proposed construction, possibly because it is contrary to the plain language of the claims themselves.  (*See supra* at 35-37.)  For example, the claims require that "illumination surface" is part of the housing, which is a separate and distinct element from the "circuit board."  (A013 ('747 patent) claims 12, 29.)  Further, because the claims require that the circuit board be "positioned adjacent to the housing," were the illumination surface of the housing to be defined as covering the circuit board, this claim limitation specifying the relative locations of the housing and circuit board would be superfluous.  (*Id.*)

Accordingly, Defendants' construction for "illumination surface" ("the layer of the housing through which the light-emitting diodes protrude") is true to the claim and specification and should be adopted in favor of Blackbird's proposal that would improperly additional requirements to the claim without intrinsic record support.

### 3.    Plaintiff's Reply Position

Plaintiff's proposed construction of "illumination surface" will aid the jury by making clear that the "illumination surface" at least partially covers the circuit board and that the "illumination surface"—as the name implies—"assists in lighting."  In contrast, Defendants' proposed construction will add nothing to the jury's understanding of this term.

Defendants argue that the portion of Plaintiff's proposed construction that would make clear that the "illumination surface" "assists in lighting" should be rejected because "'assist' or 'assists' are never used [in the patent]."  (*Supra* 38.)  But that is not the issue.  "Assists in lighting" gives meaning to the name the patentees assigned to the relevant surface: the "*illumination* surface."

The fact that the patentees labelled this surface the "illumination surface" is significant. Defendants concede that "[t]he patentees could have named the two surfaces differently (*e.g.*, a 'first' surface and a 'second' surface), but the patentees chose to use the adjectives 'illumination' and 'attachment' as a way to differentiate the surfaces." (*Supra* 26.)  In fact, in other claims, the patentees did use ordinal adjectives to differentiate between claim elements.  (*See e.g.*, A012 ('747 patent) 10:58-63 (claim 4) ("a first portion for placing…"); ("a second portion for coupling…").)  That the patentees could, and did, use that approach to label those other elements emphasizes the importance of their use of the term "***illumination*** surface" here.

Defendants claim that the significance of "illumination" lay in differentiating that "surface" from other "surfaces" by its "location," *i.e.*, that it is located on "the side through which the LEDs protrude." (*Supra* 39.)  But the location of the "illumination surface" is dictated by other claim language, which specifies that the LEDs "protrude through the plurality of illumination surface holes in the illumination surface." (*See* A013 ('747 patent) at 11:33-36 (claim 12).)  The location of the surface would, consequently, have been clear regardless of whether it was called the "first surface" or the "illumination surface."

Defendants also point to an embodiment in which the two surfaces are described as "opposite" one another.  (*Supra* 39 (citing A012 ('747 patent) at 9:16-20).)  But naming the surfaces "attachment" and "illumination" does not reflect a requirement that they be "opposite" one another.  Rather, the fact that the patentees used the word "illumination" in connection with this "surface" indicates the function of this surface.

Finally, Defendants suggest that the "illumination surface" cannot mean "assist with lighting" because "only the LEDs…illuminate." (*Supra* 38.)  That the LEDs are the objects that emit light does not mean that the "illumination surface" cannot ***assist*** with that lighting.  For

41

example, the "illumination surface" could reflect more light than the circuit board would in the absence of the "illumination surface" layer.

With respect to the other portion of Plaintiff's proposed construction, specifying that the "illumination surface" is the "layer of the housing covering the circuit board," Defendants assert that such a construction is "contrary to the plain language of the claims." (*Supra* 40.) Defendants are wrong. Defendants first point out that the circuit board "is a separate and distinct element from the" "illumination surface." (*Id*.) It is true that the "circuit board" is not the same thing as the "illumination surface," but nothing precludes one component from being positioned to cover another component. Defendants next argue that Plaintiff's proposed construction would render the limitation requiring that the "circuit board be 'positioned adjacent to the housing'" "superfluous." (*Id*.) However, positioning a component "adjacent the housing" *i.e.*, "close to or near the housing," in the parties' agreed construction (A017 (Joint Claim Chart)), specifies nothing regarding whether one component "covers" another component. An object can be adjacent to another object if it is simply next to it.

Plaintiff's proposed construction is consistent with the asserted claim. There is no dispute among the parties that the claim specifies that the LEDs on the circuit board "protrude through" the "illumination surface holes" in the "illumination surface." This necessarily requires that the "illumination surface" "cover" the circuit board, at least partially. Accordingly, "illumination surface" should be construed, in relevant part, to mean "layer of the housing covering the circuit board…."

Defendants' proposed construction, "the layer of the housing through which the light emitting diodes protrude," would add nothing to a juror's understanding of the term, because other claim limitations make clear that the LEDs "protrude through the plurality of illumination

surface holes in the illumination surface." (*See* A013 ('747 patent) at 11:33-36 (claim 12).)  In

response, Defendants assert that their proposed construction is not redundant "because the claims

require that the LEDs protrude through 'illumination surface holes in the illumination surface,'

and not just the 'illumination surface' itself." (*Supra* 37.)  At best, this shows only that

Defendants' proposed construction specifies that the LEDs protrude through the "illumination

surface," whereas the asserted claim requires that the LEDs protrude through holes in the

illumination surface, not just the "surface" generally.  Consequently, "illumination surface"

should not be construed to specify that the LEDs "protrude" through a "layer of the housing," as

Defendants request.

### 4.      Defendants' Sur-Reply Position

Blackbird's proposed construction includes the words "assists in lighting" — words and a

concept that are nowhere to be found in the specification or the prosecution history.  Blackbird

argues that insertion of these newly-minted words and concept will "aid the jury." (*Supra* at 40.)

Blackbird is not trying to aid the jury; Blackbird is trying to rewrite the claim.

Blackbird also attempts to revise the claim by arguing that its construction including the

"layer of the housing covering the circuit board" is proper because "nothing precludes one

component from being positioned to cover another component." (*Supra* at 42.)  Indeed, nothing

precludes it, but nothing requires it either.  Blackbird's proposed construction would improperly

add a vague limitation to the claim that changes the relationship of the "illumination surface"

disclosed in the specification — which is that it is part of the "housing" — to an undisclosed

relationship to something else — the "circuit board."

Patent claims must be construed in light of what is described in the specification as the

alleged invention.  Blackbird cannot treat the claim "like a nose of wax, which may be turned

and twisted in any direction … so as to make it include something more than, or something

different from, what its words express." *White v. Dunbar*, 119 U.S. 47, 51 (1886).  Here, Blackbird not only attempts to rewrite the claim, Blackbird attempts to rewrite the specification by arguing that its proposed language, "assists in lighting," is proper because "the 'illumination surface' *could reflect more light* than the circuit board would in the absence of the 'illumination surface' layer."  (*Supra* at 42 (emphasis added).)  The specification, however, is utterly silent with respect to whether the claimed "illumination surface" could reflect more light.  Nor does the specification contain any information about reflective properties that would allow one skilled in the art to determine whether a surface in an accused device is an "illumination surface" under Blackbird's construction.  Therefore, Blackbird's flight of fancy with respect to what "could" happen is unsupported by the specification and merely confuses the issues.

Blackbird criticizes Defendants' proposed construction as including a concept covered by another part of the claim — that the LEDs "protrude through" the "illumination surface" (*supra* at 42-43) — but Defendants' proposed construction is correct for that reason:  it remains true to the '747 patent's disclosure. Blackbird's proposed construction should be rejected because it does not remain true to claim 12 and the specification.

### D.    "PROTRUDE THROUGH"

#### 1.    Plaintiff's Opening Position

| Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "protrude though" | Plain meaning or "project through" | "passing from beneath a surface to the other side of that surface" |

The parties dispute with respect to this term is whether it should be narrowly defined using verbiage not drawn from any intrinsic or relevant extrinsic evidence (as Defendants propose) or whether it should be accorded its plain meaning as a commonly understood word (as

Plaintiff proposes).  In light of the unambiguous use of the term in the context of the claims, it requires no construction. To the extent it is given an affirmative construction, the term should be defined in terms of its dictionary definition, as Plaintiff proposes.

"Protrude through" is a nontechnical and commonly understood phrase, and its meaning in the claims is clear.  The claims recite a "circuit board comprising a plurality of light-emitting diodes" that "is positioned adjacent the housing so that the plurality of light-emitting diodes *protrude through* the plurality of illumination surface holes in the illumination surface."  (A013 ('747 patent) at 11:32-36 (claim 12): *see also* 12:59-64 (claim 29).)  Thus, as used in the asserted claims, "protrude through" is unambiguous in all relevant respects.  The claims specify what is protruding (the LEDs) and "through" what they are protruding ("the plurality of illumination surface holes in the illumination surface").  Indeed, Defendants themselves appear to believe that "protrude" has a meaning the jury will readily understand, since the word is part of their proposed construction for "illumination surface:" "the layer of the housing through which the light-emitting diodes *protrude*."  (A019 (Joint Claim Construction Chart).)  The jury does not need further explanation of the meaning of "protrude through" in this context. *Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1291 (Fed. Cir. 2015) ("'Being provided to' is comprised of commonly used terms; each is used in common parlance and has no special meaning in the art.  Because the plain and ordinary meaning of the disputed claim language is clear, the district court did not err by declining to construe the claim term."); *Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*, 249 F.3d 1341, 1349 (Fed. Cir. 2001) (district court did not err in failing to construe the term "melting" when "the meaning of 'melting' does not appear to have required 'construction,' or to depart from its ordinary meaning").

To the extent the Court determines that an explicit construction is required, this is a case where the unambiguous meaning of the term is so apparent that recourse to a simple dictionary definition is appropriate. *Phillips*, 415 F.3d at 1314 ("[T]he ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words. In such circumstances, general purpose dictionaries may be helpful."). Here, Plaintiff's proposed construction—which captures that the claims require the LEDs to "project through" the illumination surface holes in the illumination surface—is most consistent with the definitions found in general purpose dictionaries (*see, e.g.*, A164 (Am. Heritage Dictionary) ("protrude:" "[t]o push or thrust outward" "[t]o jut out; project")), as well as the plain and ordinary meaning of the term as determined by other courts in this District, *Robert Bosch, LLC. v. Pylon Mfg. Corp.*, 2010 WL 1417874, at *3 (D. Del. Mar. 30, 2010) (noting that "the plain and ordinary meaning of protrude [is]: 'to thrust forward' or 'to cause to project.'").

Defendants' proposed construction, on the other hand, is not drawn from any intrinsic source. Most of the intrinsic evidence to which Defendants cite (A020 (Joint Claim Construction Chart)) simply repeats the relevant claim language. Defendants' construction is thus an unsupported rewriting of the claim in an apparent effort to manufacture a non-infringement position. Defendants' proposal should be rejected. "Protrude through" needs no construction, or, in the alternative, Plaintiff's proposed construction should be adopted.

## 2. Defendants' Answering Position

Defendants' proposed construction is supported by the claims and the specification, and comports with the embodiments described in the '747 patent. Blackbird's construction, in

contrast, ignores the positional word "through" and impermissibly broadens the scope of the term.

Specifically, the parties dispute whether this claim term requires that the LEDs physically pass through the holes in the illumination surface, or whether it is enough that any portion of the LED be within the illumination surface holes. Because there is a dispute regarding the scope of the claim regarding "protrude through," this dispute between the parties should be resolved at claim construction. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) ("When the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute."). Blackbird's reliance on "plain meaning" improperly relegates this dispute over claim scope to the jury or merely postpones the construction of this term to a later stage in the case — results that would be legally impermissible and wasteful of judicial resources, respectively. Moreover, Blackbird's proposed alternative construction — "project through" — confirms an actual dispute between the parties. Blackbird seeks to ignore the disputed term's relationship to the surfaces and layers actually described in the '747 patent and instead embraces an extrinsic dictionary definition (*supra* at 46) — a wholly unhelpful construction that would impermissibly broaden the term "protrude through" beyond its usage in the '747 patent specification.

The intrinsic record shows that the use of the word "through" is significant, and indicates that an important aspect of the alleged invention is for the LEDs is to pass from one side of the illumination surface to the other. *See, e.g.*, A009 ('747 patent) at 3:41-46); A007 ('747 patent), Figures 5 and 6.) "Through" is a function word indicating "movement into at one side or point and out at another and especially the opposite side." (A167 (Merriam-Webster's Collegiate Dictionary, 11th Ed. 2003) at 1303; *see also S.C. Johnson & Son, Inc. v. The Dial Corp.*, 571 F.

Supp. 2d 984, 990 (W.D. Wis. 2008) (finding that the term "through" required the wick to extend from one end of the heating block to the other).)  This definition is in keeping with the purpose of the alleged invention, which is directed to retrofitting a light fixture with LEDs to provide low level or emergency lighting, and the usage of the disputed term in the intrinsic record.

According to the '747 patent, LEDs are mounted on a circuit board.  (*See, e.g.*, A009 ('747 patent) at 3:41-46); A007 ('747 patent), Figures 5 and 6.)  The LEDs are arranged such that they all pass through the illumination surface, which has holes provided so that each LED may pass through it.  (*See, e.g.*, A009 ('747 patent) at 3:41-46); A007 ('747 patent), Figures 5 and 6.)  Both Figures 5 and 6 are illustrative here:  they show that the LEDs, which are attached to a circuit board underneath the illumination surface, come through the holes in the illumination surface, thereby passing from one side of that surface to the other.



*Fig. 5*



**Fig. 6**

That is, the LEDs must be small enough to pass from beneath the illumination surface to the other side of that surface, as a step in the method claim 29 makes clear: "positioning the circuit board adjacent the housing so that the plurality of light-emitting diodes protrude through the plurality of illumination surface holes in the illumination surface."  (A013 ('747 patent) at 12:59-62.)  Thus, when the LEDs "protrude through," the LEDs need to physically pass from one side of the illumination surface to the other.

By ignoring the word "through," Blackbird attempts to broaden this term to encompass products in which the LEDs are too big to fit through the holes in the illumination surface or are mounted on a surface and "project" from the illumination surface.  But the intrinsic record is clear that the claims only cover products in which LEDs mounted on a circuit board positioned on one side of the illumination surface physically pass through the holes in the illumination surface to the other side.

Blackbird's argument simply substitutes "protrude" with "project" (*supra* at 44), thereby hiding the true dispute between the parties here — specifically, Blackbird seeks to avoid a requirement that "protrude through" means an object (specifically, an LED) must extend through a surface from one side to the other.  However, the clear and consistent usage of the term "protrude through" in the claims, figures, and specification compels such a requirement. Additionally, the word "project" is inherently ambiguous in the context of these claims, because LEDs themselves project light.  It is highly likely that a jury instructed with Blackbird's

49

proposed construction would be confused as to whether the structure of the LED must project through the illumination surface holes or whether the LEDs must project their light through the illumination surface holes.

Blackbird's attempt to ignore the operative word "through" in this term is further highlighted by Blackbird's reliance on *Robert Bosch, LLC v. Pylon Mfg. Corp.*, C.A. No. 08-542-SLR, 2010 WL 1417874, at *3 (D. Del. Mar. 30, 2010), for the proposition that "protrude through" is equivalent to "project through." (*Supra* at 46.) That court, however, did not have to construe the word "protrude" with the word "through," as is the case here. Rather, that court simply used the word "project" to help the jury understand the term at issue in that case.

Blackbird's proposed construction entirely ignores the importance of word "through" in the disputed term. This results in an unhelpful proposal that would require either further construction by the Court at a later date or would impermissibly send a legal dispute over claim scope to the jury, who would have no guidance from the Court on the term's meaning. *See O2 Micro*, 521 F.3d at 1360. By contrast, Defendants' proposed construction is based on the intrinsic evidence, will provide helpful guidance to the jury, and comports with the Federal Circuit's direction that actual disputes regarding claim scope must be resolved by the judge, not the jury. *See Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1319 (Fed. Cir. 2016) (a district court has a duty "to resolve a dispute about claim scope that has been raised by the parties.").

In view of the intrinsic record, the proper construction of the term "protrude through" is "passing from beneath a surface to the other side of the surface."

### 3.      Plaintiff's Reply Position

Defendants criticize Plaintiff's proposed construction primarily on the grounds that it "ignor[es] the word 'through.'" (*Supra* 47, 49.) But, the word "through" literally appears in

Plaintiff's proposed constructions.  Whether no construction is applied ("protrude *through*") or whether the term is construed as "project *through*," "through" is present.  Defendants' real issue with Plaintiff's proposed construction appears to be that it accords due weight to the term "protrude" and the context in which "protrude through" is used in claims.

The claim and specification make clear for the LEDs to "protrude through" the "illumination surface holes," they must pass through the outward-facing side of the "illumination surface holes," *i.e.*, they must project through or "jut out" of those holes.  There is no requirement in the claim that the LEDs "pass[] from beneath" the illumination surface (as Defendants argue), and no support in the specification for reading that requirement into the claim.  Accordingly, Defendants' proposed construction should be rejected and "protrude through" should either not be construed (because it has a plain and ordinary meaning to those skilled in the art) or construed as "project through."

Defendants primarily rely on the dictionary definition of "through" specifying that it is "a function word indicating 'movement into at one side or point and out at another and especially the opposite side.'"  (*Supra* 47.)  But the claim specifies that the LEDs "*protrude* through the plurality of illumination surface holes."  Defendants' singular focus on "through" results in no weight being accorded to "protrude."  Objects "protrude through" a surface when they jut out of that surface, regardless of their disposition with respect to the rest of what they are protruding through.  For example, a rock "protrudes through" the surface of the ground so long as it juts out from the ground, no matter how deep it goes into the ground.  Teeth "protrude through" the surface of the gums regardless of how deep they sit in the gums.  Accordingly, the LEDs need only "jut" or "project" through the "illumination surface holes."  The LEDs may also extend all the way through the hole and connect to the circuit board "beneath" the "illumination surface" or

that connection may occur within the "illumination surface hole."  Either way, the LEDs still "protrude through" the "illumination surface holes."

Defendants seek to rely on *S.C. Johnson*, but it does not support their argument.  The district court in *S.C. Johnson* construed the terms "***extending*** through" and "through which...***extend***," not simply "through," as Defendants suggest (*supra* 47-48).  571 F. Supp. 2d at 990.  Something that "extends through" what was, in this case, a short tube (the "wick opening") is disposed differently than something that "protrudes through" a surface.  The former is stretched through the entire length of object through which it extends, while the latter breaks the outer plane of the surface through which it protrudes.  The expert testimony on which the court primarily relied for its construction notes this difference.  *Id*. at 990 ("[P]laintiffs' expert testified that…the optimal product design would have the wick extend the full length of the opening, neither ***protruding from one end*** nor stopping short of the other end.  [Also], it appears that the wicks in the patent figures ***extend fully through the wick openings without protruding***.").[11]

Defendants contend "that an important aspect of the alleged invention is for the LEDs to pass from one side of the illumination surface to the other."  (*Supra* 47.)  Defendants primarily rely on the disclosures of Figures 5 and 6 to support this assertion.  Specifically, Defendants contend that Figures 5 and 6 show "the LEDs… attached to a circuit board ***underneath*** the illumination surface."  (*Supra* 48.)  Leaving aside that it would be improper to limit the scope of the claim based on embodiments, *Kara Tech.*, 582 F.3d at 1348, the Figures do not show this. Whether the connection between the LEDs and the circuit board is made "underneath the

---

[11] Defendants criticize Plaintiff's reliance on *Bosch* for the proposition that "the plain and ordinary meaning of protrude [is]: 'to thrust forward' or 'to cause to project'" (*supra* 50), because the term being construed was not "protrude through."  Defendants do not, however, take issue with the court's characterization of the plain meaning of "protrude," which was drawn from a different edition of the same dictionary on which Defendants' rely.  2010 WL 1417874, at *3 (citing Merriam-Webster's Collegiate Dictionary).

illumination surface" or in the "illumination surface holes" cannot be discerned from Figure 5, which is reproduced below without annotations so it is clear that the connection between the LEDs (504) and the circuit board (511) cannot be seen.



*Fig. 5*

The same is true of Figure 6, which provides an overhead view of an embodiment of the apparatus:



*Fig. 6*

All that can be discerned from Figures 5 and 6 is that the LEDs jut out from the "illumination surface," consistent with Plaintiff's proposed construction. This positioning is consistent with the purpose of the claimed invention, to provide illumination, which the LEDs do more effectively to the extent they jut out from the surface, regardless of precisely where they connect to the circuit board. Accordingly, there is no justification for narrowing the claim to

require that the connection between the LEDs "pass[] from beneath [the illumination] surface to the other side of that surface."[12]

Ultimately, Defendants' construction of "protrude through" appears to be derived from an unsupported assumption regarding how the apparatus claimed in claim 12 is assembled, specifically that the LEDs are first mounted on the circuit board and then passed through the holes in the "illumination surface." (*Supra* 49.)  There is no requirement in claim 12 that the apparatus be assembled by mounting the LEDs on the circuit board and then passing them through the "illumination surface," rather than, for example, by placing the illumination surface on the circuit board and then soldering the LEDs to connection points on the board.  Particularly because claim 12 is an apparatus claim, construing the claim terms with reference to Defendants' speculation regarding how the lighting apparatus is assembled is improper.  *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1344 (Fed. Cir. 2008) ("Courts must generally take care to avoid reading process limitations into an apparatus claim….").

"Protrude through" is a simple phrase that has a clear meaning in the context of the claim.  Accordingly, Defendants' attempt to graft a non-infringement argument onto this term should be rejected and the term should either not be construed and accorded its plain and ordinary meaning or it should be construed to mean "project through."[13]

---

[12] Defendants also point to a sentence in the specification discussing a disclosed method for retrofitting LEDs.  That language may have related to formerly asserted claim 29, but it has no relevance to the construction of claim 12, which is a pure apparatus claim.  (*Supra* 47, 48 (citing A009 ('747 patent) at 3:41-46).)

[13] Defendants also contend that the word "'project' is inherently ambiguous in the context of the asserted claim, because LEDs themselves project light." (*Supra* 49.)  "Project" is not likely to confuse a jury because, in neither the '747 patent nor the accused products, are the LEDs mounted such that they project light through the holes in the "illumination surface."  Accordingly, whether the LEDs project light through the "illumination surface" is not at issue.

### 4.     Defendants' Sur-Reply Position

In its Reply, Blackbird continues to minimize the importance of the word "through" in

the term "protrude through" in an attempt to broaden the scope of this term.  By insisting that the

term should be accorded its plain meaning or construed by simply substituting a synonym for

"protrude,"[14] Blackbird urges the Court to improperly relegate this dispute over claim scope to

the jury.  *See Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1319 (Fed. Cir.

2016) (explaining that a district court has a duty "to resolve a dispute about claim scope that has

been raised by the parties").

Blackbird argues that Defendants' construction focuses on the word "through" to the

detriment of the term "protrude."  (*Supra* at 51.)  But it is clear from Blackbird's Reply that the

real dispute is whether the LEDs must physically pass through the holes in the illumination

surface or whether the LEDs may merely "'jut out' of these holes."  (*Id*.)  In essence, Blackbird

improperly attempts to rewrite and broaden the claims by replacing "protrude through" with

"protrude from."[15]  Blackbird's attempted broadening of the claim is contrary to the intrinsic

record.

---

[14]  Blackbird's alternative construction to plain meaning is "project through."  This is singularly unhelpful in the context of these claims because LED lights project light, and a jury instructed with this construction may be confused as to whether the physical structure of the LED must project through the illumination surface holes or whether it is the light from the LEDs that must project through the illumination surface holes.  (Defs.' Response at 19).

[15]  In attempting to distinguish *S.C. Johnson*, Blackbird shows that Applicants could have chosen a different positional word had they wanted to claim LEDs that "jut out," as Blackbird argues here.  (*Supra* at 52, 53.)  In *S.C. Johnson*, the court used "***protruding from***" to mean "juts out." *See S.C. Johnson & Son, Inc. v. The Dial Corp.*, 571 F. Supp. 2d 984, 990 (W.D. Wis. 2008). Thus, if the only significant element of the alleged invention was the requirement that the LEDs "jut out" of the illumination surface holes, rather than that the LEDs physically pass through the holes in the illumination surface from one side to the other side, Applicants could have used the term "protrude from," rather than the term they chose to use throughout the intrinsic record.

Here, again, claim 29 is instructive because it makes clear that the LEDs must pass from

beneath the illumination surface to the other side of that surface as a step in the claimed method:

"positioning the circuit board adjacent the housing so that the plurality of light-emitting diodes

[mounted on the circuit board] protrude through the plurality of illumination surface holes in the

illumination surface."  (A013 ('747 patent) at 12:59-62).  A construction of the term "protrude

through" that does not require the LEDs to physically pass from one side of the illumination

surface to the other would be nonsensical in the context of this claim.  Therefore, it cannot be the

correct construction for *any* claim, including claim 12.  *See, e.g.*, *Felix*, 562 F.3d at 1178 (the

term "mounted on" means "affixed to," because usage of the same term with respect to other

components in different claim would be nonsensical if competing definition were adopted).

Blackbird does not argue that "protrude through" means something different in claim 12

than it does in claim 29.  Rather, Blackbird accuses Defendants of "construing the claim terms

with reference to speculation regarding how the lighting apparatus is assembled is improper."

(*Supra* at 54.)  However, Defendants do not read any method limitation from claim 29 into the

apparatus claim 12.  Instead, Defendants follow critical Federal Circuit precedent that the

meaning of a claim term, such as "protrude through," must be consistent in all claims where it is

used in the same patent.  *See Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1579 (Fed.

Cir. 1995) ("[C]laim terms must be interpreted consistently.  Interpretation of a disputed claim

term requires reference not only to the specification and prosecution history, but also to other

claims.  The fact that we must look to other claims using the same term when interpreting a term

in an asserted claim mandates that the term be interpreted consistently in all claims."); *see also*

*Felix*, 562 F.3d at 1178; *Georgia-Pacific Corp.*, 195 F.3d at 1331 ("Unless the patent otherwise

provides, a claim term cannot be given a different meaning in the various claims of the same

patent."). Thus, Blackbird's argument that the LEDs may merely "jut out" of the holes in the

illumination surface, contrary to the meaning of protrude through in claim 29, is not supported

by the intrinsic record or the law of claim construction.[16]

Contrary to Blackbird's assertion, Defendants are not reading a limitation into claim 12,

but rather Defendants properly rely on the disclosures of the intrinsic record with respect to the

structure of the claimed apparatus.  The intrinsic record is clear in its descriptions, including the

relative positions of the circuit board, the LEDs, and the illumination surface holes.  (*See, e.g.*,

A009 ('747 patent) at 3:41-46; A007 ('747 patent), Figures 5 and 6; A013 ('747 patent) at 12:59-

62).  By contrast, as Blackbird's Reply shows, Blackbird's proposed construction is designed to

broaden this term to encompass products in which the LEDs do not "protrude through" the

illumination surface, but rather sit on top of the illumination surface with only their connection

points passing through the illumination surface to the circuit board.  (*Supra* at 51.)[17]  There is

nothing in the intrinsic record to support a construction broad enough to encompass such

products, and indeed, Blackbird points to no such support.

---

[16]  Blackbird's proposed construction is an attempt to broaden the claim to cover a design where the LEDs are too large to pass through the "holes" in the illumination surface, and are merely sitting on top of that surface and are "jutting out" from that surface.

[17]  Blackbird references several examples that it contends amount to "protruding through," including "a rock 'protrudes through' the surface of the ground so long as it juts out from the ground, no matter how deep it goes into the ground" (*supra* at 51) and "teeth 'protrude through' the surface of the gums regardless of how deep they sit in the gums" (*id.*).  These examples do not support Blackbird's proposed construction.  With respect to a rock "protruding through" the surface of the ground, the more standard phrasing would be that the rock "protrudes from" the ground.  As to teeth, they "protrude through" the gums precisely because they pass from one side of the gums to the other:  teeth are set in the bone, then pass through the gums all the way from the side that interfaces with the bone to the side the interfaces with the mouth cavity.  Therefore, it is not that the teeth protrude through "regardless of how deep they sit in the gums," as Blackbird argues, but teeth protrude through because they physically pass from one side of a surface to the other — exactly as the LEDs pass from one side of the illumination surface to the other as described in the '747 patent.

E.      "FASTENING MECHANISM"

1.      Plaintiff's Opening Position

| Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "fastening mechanism for securing the attachment surface of the lighting apparatus to the illumination surface" | Plaintiff contends that this is not a means-plus-function clause under Section 112, ¶ 6. | Defendants assert this is a means-plus-function claim under 35 U.S.C. § 112, ¶ 6. |
| | To the extent the term is found not to be a means-plus-function limitation, the parties agree that it should be construed as "a mechanism that attaches the attachment surface to the illumination surface, directly or indirectly." | |
| | To the extent this clause is governed by § 112, ¶ 6, Plaintiff identifies the following structures(s) in the specification that correspond to the function "securing the attachment surface of the lighting apparatus to the illumination surface": the structure depicted in Figure 5, adhesive strips, "magnet, clips, screws, etc" and equivalents under 112 ¶ 6. | To the extent Section 112, ¶ 6 governs, Defendants identify the following structures in the specification that perform the function of "securing the attachment surface of the lighting apparatus to the illumination surface": a double-sided adhesive strip, a magnet, clips, screws, and equivalents. |

The parties' primary disputes with respect to this term is (1) whether the clause is a means-plus-function limitation, and (2), to the extent it is a means-plus-function limitation, whether certain structures in the specification correspond to the agreed function of "securing the attachment surface of the lighting apparatus to the illumination surface."

a)  "Fastening mechanism" is not a means-plus-function limitation.

Because the "fastening mechanism" clause does not use the word "means," the term is presumed to not invoke § 112, ¶ 6. *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015) (en banc in relevant portion).  Defendants bear the burden of overcoming the presumption that § 112, ¶ 6 does not apply by a preponderance of the evidence. *Apex Inc. v.*

*Raritan Computer, Inc.*, 325 F.3d 1364, 1372 (Fed. Cir. 2003).[18]  In determining whether the presumption is overcome, courts must examine "whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Williamson*, 792 F.3d at 1349.  Here, the term itself, its use in the claims, and the disclosure of the specification make clear that a skilled artisan would understand the term as having a sufficiently definite meaning as the name for structure.

 *First*, "fastening mechanism" is a simple term that a skilled artisan would understand as referring to a category of structures that are used to fasten components.  Indeed, the parties agree that, to the extent § 112, ¶ 6 does not apply, a skilled artisan would understand that this term means "a mechanism that attaches the attachment surface to the illumination surface, directly or indirectly."  (A017 (Joint Claim Construction Chart).)  That construction describes structure. *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1361 (Fed. Cir. 2004) (holding that "the term 'connector assembly' means a unit that joins, fastens, or links each pair of adjacent support members" and that this is "a name for structure"), *overruled on other grounds by Williamson*, 792 F.3d at 1349.

 This conclusion is not altered because the term does not define a single, precise, structure, as courts, including the Federal Circuit, have repeatedly held.  *Lighting World*, 382 F.3d at 1361 ("The fact that more than one structure may be described by that term, or even that the term may encompass a multitude of structures, does not make the term 'connector assembly'

---

[18] Although *Williamson* overruled cases to the extent they held that the absence of the word "means" gives rise to a "strong" presumption against means-plus-function treatment and eliminated the requirement that the challenger show the term be "devoid of anything that can be construed as structure," 792 F.3d at 1349, it did not otherwise alter the law surrounding the application of § 112, ¶ 6.  Accordingly, pre-*Williamson* cases remain good law in other respects. *Triplay, Inc. v. Whatsapp, Inc.*, 2016 WL 3574012, at *5 (D. Del. June 30, 2016) ("[T]he Court agrees … that it should still utilize pre-*Williamson* Federal Circuit caselaw in analyzing whether disputed terms convey sufficiently definite structure to a skilled artisan.").

any less a name for structure."); *Personalized Media Commun., LLC v. Intl. Trade Commn.*, 161

F.3d 696, 705 (Fed. Cir. 1998) ("[N]either the fact that a 'detector' is defined in terms of its

function, nor the fact that the term 'detector' does not connote a precise physical structure in the

minds of those of skill in the art detracts from the definiteness of structure.  Even though the

term 'detector' does not specifically evoke a particular structure, it does convey to one

knowledgeable in the art a variety of structures known as 'detectors.'"); *Greenberg v. Ethicon

Endo-Surgery, Inc.*, 91 F.3d 1580, 1583 (Fed. Cir. 1996) ("It is true that the term 'detent' does not

call to mind a single well-defined structure, but the same could be said of other commonplace

structural terms such as 'clamp' or 'container.'  What is important is not simply that a 'detent' or

'detent mechanism' is defined in terms of what it does, but that the term, as the name for

structure, has a reasonably well understood meaning in the art."); *see also Hubbell, Inc. v. Pass

& Seymour, Inc.*, 781 F. Supp. 2d 67, 82 (D. Conn. 2011) ("It may be true that the term 'latching

mechanism' as used in the claim would not convey any one particular design for a latching

mechanism, but it is implausible that people reasonably skilled in the art would not understand

what a latching mechanism is and how it could be designed."); *Bonutti Research, Inc. v. Lantz

Med., Inc.*, 2016 WL 247752, at *21 (S.D. Ind. Jan. 21, 2016) (determining that "lockout

element" was not subject to § 112, ¶ 6 because it was not "significantly different from the term

'lock' and … one of ordinary skill in the art at the time of the invention would have understood

the former, like the latter, to be a name for a class of structures.").

Similarly, the fact that the ***structures*** are named for the function they perform, *i.e.*, by the

fact that they fasten, also does not invoke § 112, ¶ 6.  *Greenberg*, 91 F.3d at 1583 (rejecting

application of § 112, ¶ 6 and noting "[m]any devices take their names from the functions they

perform"); *Neonatal Prod. Group, Inc. v. Shields*, 2016 WL 1746788, at *13 (D. Kan. May 3,

2016) (determining that "heating element" was not subject to § 112, ¶ 6 because "[o]ne of ordinary skill in the art would understand this term to mean 'an element that heats.'").

In assessing whether a term invokes § 112, ¶ 6, the Federal Circuit has looked to contemporaneous dictionary definitions to assist in determining whether a word had a well-understood meaning as a name for structure.  *See, e.g.*, *Flo Healthcare Sols., LLC v. Kappos*, 697 F.3d 1367, 1374 (Fed. Cir. 2012) (rejecting the application of § 112, ¶ 6 because, *inter alia*, "[d]ictionary definitions … show that the noun 'adjustment,' which modifies 'mechanism' here, has a reasonably well-understood meaning as a name for a structure.").  Here, contemporaneous dictionaries demonstrate that "fasten" was understood to mean "to attach firmly to something else, as by pinning or nailing."  (*See, e.g.*, A643 (Am. Heritage Dictionary); *see also id*. ("fastening" "Something, such as a hook, used to attach one thing to another firmly.")  When combined with "mechanism," the plain meaning of "fastening" makes clear that the claim term encompasses a class of structures that secure the illumination surface to the attachment surface.

*Second*, the claims recite structural detail regarding the "fastening mechanism." Specifically, the claims specify what components the mechanism is connected to and how it interacts with those components, *i.e.*, securing them to one another.  These structural details further reinforce the structural nature of the term.  *See Inventio AG v. ThyssenKrupp Elevator Ams. Corp.*, 649 F.3d 1350, 1359 (Fed. Cir. 2011) (holding that "modernizing device" was not a means-plus-function limitation because, *inter alia*, the "claims…delineate the components that the modernizing device is connected to, describe how the modernizing device interacts with those components, and describe the processing that the modernizing device performs.").

*Third*, the specification confirms that "fastening mechanism" is not a purely functional limitation.  Although, in assessing whether a term is subject to § 112, ¶ 6, the inquiry focuses on

whether the claims recite structure, the Federal Circuit has made clear that "it is proper to consult the intrinsic record, including the written description, when determining if a challenger has rebutted the presumption that a claim lacking the term 'means' recites sufficiently definite structure." *Inventio*, 649 F.3d at 1357.  Here, the specification consistently uses the term "fastening mechanism" in a structural sense, providing concrete, structural examples of fastening mechanisms.  (*See, e.g.*, A009 ('747 patent) at 3:15-16 ("In some embodiments, the fastening mechanism may include an adhesive strip having a protective cover."); A012 at 9:39-41; A007 at Figure 5.)  Further, consistent with the use of the term to capture a class of structures, the specification provides an exemplary list of fastening mechanisms, each of which is structural. (A012 ('747 patent) at 9:47-51 ("[I]n alternative embodiments many different types of fastening mechanisms 534 may be used.  For example, in some embodiments the ***fastening mechanism 534 may use a magnet, clips, screws, etc***.").)  These disclosures show that the term "fastening mechanism" conveys structure to a skilled artisan.  *See Flo Healthcare*, 697 F.3d at 1374 (holding that "height adjustment mechanism" was used "to designate a class of structures that are generally understood to persons of skill in the art" because, *inter alia*, the written description stated that "[i]n addition [to a gas-spring mechanism], other types of height adjustment mechanisms would also be suitable, such as a rack and pinion mechanism, a cable and pulley mechanism, a ratchet mechanism, a ball screw mechanism, a removable pin and holes arrangement, and so forth.").

A skilled artisan would therefore recognize that the "fastening mechanism" term has a sufficiently definite meaning as the name for structure, *i.e.*, a mechanism that fastens or attaches, as reflected in the parties' agreed non-means-plus-function construction.  Accordingly,

Defendants' request that this term should be construed as a means-plus-function limitation should be rejected.

### b) Plaintff's proposed corresponding structure is correct.

To the extent the "fastening mechanism" term is construed as a means-plus-function limitation, the parties agree that the function recited in the claim is "securing the attachment surface of the lighting apparatus to the illumination surface." The parties also agree on much of the corresponding structure. The primary dispute regarding the corresponding structure is whether "the structure depicted in Figure 5" should be included as corresponding structure.

Plaintiff's proposed inclusion of "the structure depicted in Figure 5" as corresponding structure is proper. "Structure disclosed in the specification qualifies as a 'corresponding structure' if the intrinsic evidence clearly links or associates that structure to the function recited in the claim." *Williamson*, 792 F.3d at 1352. "A means-plus-function claim encompasses all structure in the specification corresponding to that element and equivalent structures," including all disclosed embodiments that "correspond to the claimed function," *Micro Chem., Inc. v. Great Plains Chem. Co., Inc.*, 194 F.3d 1250, 1258, 1259 (Fed. Cir. 1999), and corresponding structure disclosed in figures, *WMS Gaming, Inc. v. Intl. Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999) (finding corresponding structure in a figure). Figure 5, shown below with annotations, discloses an embodiment in which the attachment surface of the lighting apparatus is structurally secured to the illumination surface:



Fig. 5

As evidenced by the structures that both parties agree correspond to the relevant function—adhesive strips, "a magnet, clips, screw,"—all mechanisms for securing disclosed in connection with Figure 5 correspond to the claimed function.  So too should the structures shown in Figure 5.[19]

---

[19] Additionally, the corresponding structure should include the "etc." that is disclosed in the portion of the specification from which both parties draw the remainder of their corresponding structure: "For example, in some embodiments the fastening mechanism 534 may use a magnet, clips, screws, *etc*."  (A012 ('747 patent) at 9:48-50.)  The use of "etc" in this context emphasizes the increased breadth of the already broad range of explicitly recited structures that the specification intended to disclose as performing this function.  Accordingly, it provides useful context to the finder of fact in considering whether a structure is an equivalent under Section 112, ¶ 6.

### 2.    Defendants' Answering Position

#### a)  "fastening mechanism" Must Be Construed as a Means-plus-function Term Pursuant to 35 U.S.C. § 112, ¶ 6

"Fastening mechanism" should be construed as a means-plus-function term here because it is a functional limitation with no structure provided.  The Federal Circuit has identified two traditional ways to overcome the presumption that a term is not in means-plus-function format when the term lacks the word "means":

> We have also traditionally held that when a claim term lacks the word "means," the presumption can be overcome and § 112, para. 6 will apply if the challenger demonstrates that the claim term fails to "recite[] sufficiently definite structure" or else recites a "function without reciting sufficient structure for performing that function."

*Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015) (quoting *Watts v. XL Sys., Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2000)).   "The standard is whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure."  *Id*. at 1349.

As in *Williamson*, the disputed term here is drafted in the same format as a traditional means-plus-function limitation.  792 F.3d at 1350.  First, there is the generic phrase "fastening mechanism" that is devoid of any structural terms or definitions, followed by the word "for," and finally, a description of the function to be performed by the generic "mechanism," *i.e*, "securing the attachment surface of the lighting apparatus to the illumination surface."[20]  Just as in *Williamson*, where the disputed term merely replaced the word "means" with the word "module"

---

[20]  As the Federal Circuit noted in *Williamson*, one must be careful using a shorthand phrase for the claim limitation in question — which here would be "fastening mechanism" — because the entire phrase is the claim limitation — "fastening mechanism for securing the attachment surface of the lighting apparatus to the illumination surface" — and the entire claim limitation can be assessed to determine if it is "in a format consistent with traditional means-plus-function claim limitations."  *Williamson*, 792 F.3d at 1350.

(*id.*), claim 12 of the '747 patent merely replaces the word "means" with the word "mechanism."

As the Federal Circuit made plain in *Williamson*, the word "mechanism" is a generic or "nonce

word" just like the word "means":

> Generic terms such as "mechanism," "element," "device," and
> other nonce words that reflect nothing more than verbal constructs
> may be used in a claim in a manner that is tantamount to using the
> words "means" because they "typically do not connote sufficiently
> definite structure" and therefore may invoke § 112, para. 6.

*Williamson*, 792 F.3d at 1350 (quoting *Mass. Inst. Tech. for Imaging, Inc. v. Abacus Software*,

462 F.3d 1344, 1354 (Fed. Cir. 2006)); *see also Welker Bearing Co. v. PHD, Inc.*, 550 F.3d

1090, 1096 (Fed. Cir. 2008) (quoting same case).

In cases like this, where there are one or more "prefix" words that precede the word

"means," "mechanism," or the like, the Court can look to the preceding word or words to

determine if the disputed limitation is in means-plus-function format.  Here, the prefix is the

adjectival modifier "fastening."  The claim drafter's choice of using an adjective to describe

what the mechanism does, instead of a noun to state what it is, has consequences.

In *MIT*, the Federal Circuit assessed the claim limitation "colorant selection mechanism"

and concluded that "the adjectival modifier 'colorant selection' was not defined in the

specification and did not carry any generally understood structural meaning in the art."  *Welker*,

550 F.3d at 1096 (citing *MIT*, 462 F.3d at 1354).  Similarly, in *Williamson*, the Federal Circuit

analyzed the phrase "distributed learning control," and ruled that "[t]hese words do not describe

a sufficiently definite structure."  *Williamson*, 792 F.3d at 1351.  The same conclusion follows

here.

The prefix here — "fastening" — is an adjective that describes what the claimed

"mechanism" does, not what it is.  This is unlike *Greenberg v. Ethicon Endo-Surgery, Inc.*,

91 F.3d 1580 (Fed. Cir. 1996) (cited *supra* at 60), where the noun "detent" was used in the claim phrase "detent mechanism," and "detent" had a "generally understood meaning in the mechanical arts" and dictionary definitions of the term "connoted adequate structure." *Welker*, 550 F.3d at 1096.  Other cases cited by Blackbird are similarly distinguishable because they involved disputed terms where the prefix to the nonce word was a noun that connoted structure to one of skill in the art.  *See Flo Healthcare Sols., LLC v. Kappos*, 697 F.3d 1367, 1374 (Fed. Cir. 2012) (analyzing "the noun 'adjustment,' which modifies 'mechanism' here") (cited *supra* at 61); *Personalized Media Commc'ns, LLC v. Int'l Trade Commn.*, 161 F.3d 696, 705 (Fed. Cir. 1998) (finding the noun "detector" is "not a generic structural term such as 'means,' 'element,' or 'device'") (cited *supra* at 60).

Claim 12 does not use the phrase "fastener mechanism" or any similar noun-based claim limitation.  Instead, it uses the word "fastening" which is an action, not a thing or a structure. Similar to the result in *Williamson*, the word "fastening" does not "describe a sufficiently definite structure."  *See Williamson*, 792 F.3d at 1351 (analyzing the prefix "distributed learning control").  The word "mechanism" also does not provide any indication of structure "because it sets forth the same black box recitation of structure for providing the same specified function as if the term 'means' had been used."  *Id*. at 1350 (addressing the word "module").

Again, as in *Williamson*, there is nothing in the specification or prosecution history that alters this conclusion.  *See id*. at 1351.  Although the specification provides examples of what the "fastening mechanism" could be (A009 ('747 patent) at 3:15-16; 9:39-51), it also describes the function that it performs in purely functional terms:  "The fastening mechanism 534 *performs the function* of securing the attachment surface 530 of the housing 528 to the ballast cover."  (A012 ('747 patent) at 9:37-39 (emphasis added).)

Notably, the remainder of claim 12 provides no additional information as to the structure of "fastening mechanism." Indeed, the claim is silent with regard to structure or how the "fastening mechanism" interacts with other claimed components "in a way that might inform the structural character of the limitation-in-question or otherwise impart structure to the [limitation] as recited in the claim." *Williamson*, 792 F.3d at 1351; *see also Intellectual Ventures I LLC v. AT&T Mobility LLC*, C.A. Nos. 13-1668-LPS to 13-1672-LPS and 14-1229-LPS to 14-1233-LPS, 2016 WL 4363485, at *6 (D. Del. Aug. 12, 2016) (applying § 112, ¶ 6 after finding "the claim does not recite *any* structure"); *Viatech Techs., Inc. v. Microsoft Corp.*, C.A. No. 14-1226-RGA, 2016 WL 3398025, at *10, 13 (D. Del. June 14, 2016) (applying § 112, ¶ 6 after finding insufficient structure because although the specification recited structure, the claims did not); *Lifeport Scis. LLC v. Endologix, Inc.*, C.A. No. 12-1791-GMS, 2015 WL 4141819, at n.8 (D. Del. July 9, 2015) ("[A] description of structure in the specification is not enough to avoid application of § 112(f) [*i.e.*, the former § 112, ¶ 6].").

Blackbird argues that a person of ordinary skill in the art would understand "fastening mechanism." (*Supra* at 59.) But all one of skill in the art can know from reading claim 12 is the action or purpose for the "fastening mechanism" — "securing the attachment surface of the lighting apparatus to the illumination surface" — and not what physical thing is performing that action or how that thing is or could be constructed.

Blackbird also argues that "the parties agree that, to the extent § 112, ¶ 6 does not apply, a skilled artisan would understand that this term means 'a mechanism that attaches the attachment surface to the illumination surface, directly or indirectly.'" (*Supra* at 59.) However, the word "mechanism" in the contingent agreed-to construction does not describe structure any more than the "fastening mechanism" does. As the Federal Circuit has explained, the word

"mechanism" is a "nonce word" that fails to provide any insight into what the structure of the

"mechanism" is or how the "mechanism" works.  *See Williamson*, 792 F.3d at 1350 (noting that

"[g]eneric terms such as 'mechanism' … is tantamount to using the word 'means' because they

'typically do not connote sufficiently definite structure'") (quoting *Mass. Inst. of Tech.*, 462 F.3d

at 1354).

Blackbird also cites to dictionary definitions for "fasten" — "to attach firmly to

something else, as by pinning or nailing" —— and "fastening" — "[s]omething such as a hook,

used to attach one thing to another firmly."  (*Supra* at 61.)  But Blackbird's definitions fail to

take into account the context of the '747 patent which relates to lighting fixtures having, for

example LEDs and a circuit board, that would be damaged if they were subjected to "pinning,"

"nailing," or "hooks."  Blackbird's dictionary definitions cannot overcome the teachings of the

'747 patent.  *Williamson*, 792 F.3d at 1352 ("[I]f a person of ordinary skill in the art would be

unable to recognize the structure in the specification and associate it with the corresponding

function in the claim, a means-plus-function clause is indefinite.").

### b)   Defendants' Proposed Corresponding Structure Should Be Adopted

To construe a means-plus-function claim term, the Court must identify the claimed

function and the corresponding structure that is clearly linked in the specification's disclosure to

performing the claimed function.  *Williamson*, 792 F.3d at 1352 ("Structure disclosed in the

specification qualifies as 'corresponding structure' if the intrinsic evidence clearly links or

associates that structure to the function recited in the claim.").

The parties agree that, when "fastening mechanism" is construed to be means-plus-

function, the claimed function of the "fastening mechanism" is "securing the attachment surface

of the lighting apparatus to the illumination surface."  (A021 (Joint Chart).)  The '747 patent

specification describes the structure that can perform this function as a double-sided adhesive strip, a magnet, clips, and screws.  (A009 ('747 patent) at 3:15-16 ("In some embodiments, the fastening mechanism may include an adhesive strip having a protective cover."); A012 ('747 patent) at 9:40-42 ("In the illustrated embodiment, the fastening mechanism 534 is an adhesive strip 534 having a protective cover."); A012 ('747 patent) at 9:50-51 ("[I]n some embodiments the fastening mechanism 534 may use a magnet, clips, screws, etc.").)  Thus, under Section 112, ¶ 6, the construction of the structures should be "a double-sided adhesive strip, a magnet, clips, screws, and equivalents."  (*See* A021 (Joint Chart).)

Blackbird asserts that if Section 112, ¶ 6 applies, the structures should be defined as "the structure depicted in Figure 5, adhesive strips, 'magnet, clips, screws, etc' and equivalents under 112 ¶ 6."  (*Supra* at 64, n.19.)  Blackbird's inclusion of Figure 5 and "etc" are contrary to Federal Circuit law, which require that the corresponding structure be specifically disclosed.[21] Further, and strangely, while Blackbird seeks to reference Figure 5, that figure shows a double-sided adhesive strip (*see* A012 ('747 patent) at 9:40-48), but Blackbird fails to incorporate "double-sided" in its proposed construction.

Accordingly, "fastening mechanism for securing the attachment surface of the lighting apparatus to the illumination surface" should be construed as a means-plus-function claim and thus be limited to the corresponding structures that perform the claimed function of "securing the attachment surface of the lighting apparatus to the illumination surface": a double-sided adhesive strip, a magnet, clips, screws, and equivalents.

---

[21] Blackbird's colored annotation of Figure 5 on page 64 of its opening position misstates the disclosure of the '747 patent.  Instead of pointing to the "fastening mechanism," *i.e.*, the double-sided adhesive strip (534), Blackbird points to **housing** (528) as the "fastening mechanism."

3.      **Plaintiff's Reply Position**

a)  **Defendants fail to meet their burden of establishing that
    "fastening mechanism" is a means-plus-function limitation.**

Defendants offer four arguments in support of their effort to establish that "fastening

mechanism" should be treated as a means-plus-function limitation.  Each fails.

*First*, and primarily, Defendants contend that, although "prefix words" can supply

sufficient structure to nonce words that would otherwise be subject to § 112, ¶ 6, "fastening"

cannot connote structure because it is an adjective, not a noun.  (*Supra* 66-67.)  This distinction

has no support in law or, for that matter, grammar.

The Federal Circuit has never held that "prefix words" that are adjectives cannot connote

structure.  As an initial matter, all "prefix words" that modify a nonce word—regardless of

whether they are nouns, adjectives, or verbs—function as adjectives *because* they modify the

nonce word.  This is why the "prefix words" are referred to as "adjectival" modifiers or

qualifications.[22]  *See, e.g.*, *Apex*, 325 F.3d at 1374 ("[E]very use of the term in the asserted

claims includes additional *adjectival qualifications* ["interface," "programming," and "logic"]

further identifying sufficient structure to perform the claimed functions to one of ordinary skill in

the art.").

---

[22] Defendants appear to believe that "adjectival modifier" is a pejorative that refers to "prefix
words" that are adjectives, rather than nouns.  It is not.  *Clarian Health Partners, Inc. v. Leavitt*,
2006 WL 2661477, at *3 (S.D. Ind. Sept. 15, 2006) (noting, in the statutory construction context,
that "an adjectival…modifier is a 'word, phrase, or clause *that works like an adjective*'" (quoting
Kenneth G. Wilson, The Columbia Guide to Standard American English 13 (Columbia Univ.
Press. 1993)).  That all "prefix words" are "adjectival modifiers," regardless of whether the
modifying words are themselves adjectives, or other parts of speech acting as adjectives, is
reflected even in the cases on which Defendants rely.  For example, Defendants state that, in
*Welker*, the Federal Circuit characterized the "prefix words" "colorant selection" as an
"adjectival modifier," suggesting that this fact weighed in favor of applying § 112, ¶ 6.  (*Supra*
66.)  Yet, "colorant" and "selection" are both nouns.

71

The relevant legal issue is not how the words are grammatically classified, but rather "whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Williamson*, 792 F.3d at 1349. Thus, to the extent the words connote structure, the presence of an "adjectival modifier" weighs against means-plus-function treatment, regardless of whether the words are themselves adjectives. *Cf.* *Welker*, 550 F.3d at 1096 (applying § 112, ¶ 6 to "mechanism for moving said finger" because "[n]o ***adjective*** endows the claimed 'mechanism' with a physical or structural component.").

The point Defendants appear to be trying to make is not that "fastening" fails to connote structure because it is an adjective, but that "fastening" does not add anything structural to "mechanism" because "'fastening'…is an action, not a thing or structure." (*Supra* 67.) However, this is also wrong as a matter of law. The Federal Circuit has repeatedly held that mechanisms can be defined in functional terms. For example, in *Greenberg*, the Federal Circuit held that the term "detent mechanism" was not subject to § 112, ¶ 6 because it had "a generally understood meaning in the mechanical arts, ***even though the definitions are expressed in functional terms***." 91 F.3d at 1583 (noting that dictionaries defined "detent" as, *inter alia*, "a part of a mechanism (as a catch, pawl, dog, or click) that locks or unlocks a movement"). Thus, "detent mechanism" conveyed structure to skilled artisans, even though that structure was defined in functional terms. *Id*. at 1583 (noting that "[m]any devices take their names from the functions they perform."); *Personalized Media*, 161 F.3d at 705 (term not subject to means-plus-function treatment even though it "is defined in terms of its function").[23]

---

[23] Defendants' attempts to distinguish *Flo Healthcare* and *Personalized Media* fail. Those cases turned on the fact that terms "ha[d] a reasonably well-understood meaning as a name for a structure," not that the terms were nouns. *Flo Healthcare*, 697 F.3d at 1374; *see also Personalized Media*, 161 F.3d at 705 ("[A]n ***adjectival*** qualification ('digital') placed upon otherwise sufficiently definite structure ('detector')…further narrows the scope of those

The same is true here.  Defendants inadvertently concede this point through their argument that the term "fastener mechanism" would sufficiently connote structure.  (*Supra* 67.) Defendants are correct that a skilled artisan would understand the word "fastener" to connote structure.  However, a "fastening mechanism" *is* a fastener, and a skilled artisan would understand both terms in the same structural way.  Defendants object that a skilled artisan would not know "what physical thing is performing [the fastening]."  (*Supra* 68.)  But using a term directed to a broad category of structure, rather than a single "physical thing," is permissible.[24] *Lighting World*, 382 F.3d at 1361 ("The fact that more than one structure may be described by [the] term, or even that the term may encompass a multitude of structures, does not make [it] any less a name for structure."); *Personalized Media*, 161 F.3d at 705 (term not subject to means-plus-function treatment even though it "convey[s]…a variety of structures" to skilled artisan).

**Second**, Defendants criticize Plaintiff's dictionary definitions of "fasten" and "fastening" because, they contend, certain components in the invention would be damaged if some of the "fastening mechanisms" set forth were used in the invention.  (*Supra* 69.)  Defendants are correct that a skilled artisan would understand that certain fastening mechanisms would be appropriate for use with the invention and others would not be.  This narrows the claim, making clear that what is claimed is not any mechanism that could be used to fasten two surfaces together in any art, but "fastening mechanisms" that are used in this art to secure such components.

---

structures covered by the claim and makes the term more definite").

[24] Defendants rely upon *MIT,* but in *MIT*, the Federal Circuit's decision to apply § 112, ¶ 6 to the term "colorant selection mechanism" was based on the facts that it was "not defined in the specification and has no dictionary definition, and there is no suggestion that it has a generally understood meaning in the art." 462 F.3d at 1354.  Here, "fastening" has a dictionary definition and a generally understood meaning in the art.

*Third*, Defendants assert that "claim 12…is silent...[as to] how the 'fastening mechanism' interacts with other claims components." (*Supra* 68.)  Not so.  The claim specifies that the fastening mechanism secures "the attachment surface of the lighting apparatus to the illumination surface."  (A013 ('747 patent) at 11:37-39 (claim 12).)  The Federal Circuit made clear in *Inventio* that specifying what components the mechanism is connected to and how it interacts with those components reinforces that a term is structural in nature.  649 F.3d at 1359.  Defendants fail to even attempt to distinguish this authority.[25]

*Fourth*, Defendants claim that nothing in the specification suggests that "fastening mechanism" connotes structure.  (*Supra* 67.)  However, as Defendants concede, the specification gives a number of concrete, structural examples of "fastening mechanisms."  (A012 ('747 patent) at 9:47-51.)  As such, a skilled artisan, reading the claim, would understand that "fastening mechanism" connotes structure.  *Flo Healthcare*, 697 F.3d at 1374 (holding term not subject to § 112, ¶ 6 because, *inter alia*, the written description stated that "[i]n addition [to a gas-spring mechanism], other types of height adjustment mechanisms would also be suitable, such as a rack and pinion mechanism, a cable and pulley mechanism…, and so forth.").  Defendants point out that the specification also states that "[t]he fastening mechanism 534 performs the function of

---

[25] Defendants cite three cases in which this Court and another in this District found claim terms to be subject to means-plus-function treatment, but these cases are inapposite.  *Intell. Ventures I LLC v. AT&T Mobility LLC*, 2016 WL 4363485, at *6 (D. Del. Aug. 12, 2016), involved a term ("a structure") with no adjectival modifier, unlike the one at issue here.  *Lifeport Scis. LLC v. Endologix, Inc.*, 2015 WL 4141819, at *5 (D. Del. July 9, 2015), also involved a claim term with no adjectival modifier ("[a] system for introducing…").  In addition, the party seeking to avoid means-plus-function treatment improperly attempted to rely on structure disclosed only in the specification.  Here, Plaintiff relies on the specification only to establish that the claim term has a structural meaning, an approach that the Federal Circuit has repeatedly endorsed, *see, e.g.*, *Inventio*, 649 F.3d at 1357.  Finally, in *Viatech Techs., Inc. v. Microsoft Corp.*, 2016 WL 3398025, at *10 (D. Del. June 14, 2016), the party conceded that the term ("license monitor and control mechanism") did "not have a commonly understood meaning in the art as the name for structure."  In contrast, Plaintiff contends that "fastening mechanism" is commonly understood as the name for structure.

securing the attachment surface 530 of the housing 528 to the ballast cover." (*Supra* 67.)  But,

merely also using function to characterize the term does not change the fact that a skilled artisan

would understand the "fastening mechanism" as performing that function in structural terms, as

indicted by the other aspects of the specification discussing structure.[26]

   "Fastening mechanism" is a simple term that a skilled artisan would understand as

referring to a category of structures used to fasten components.  Defendants bear the burden of

showing otherwise by clear and convincing evidence, *Apex*, 325 F.3d at 1372, and have not done

so.  Accordingly, "fastening mechanism" should not be treated as a means-plus-function

limitation and should be construed as agreed by the parties: "a mechanism that attaches the

attachment surface to the illumination surface, directly or indirectly."

### b)  Plaintiff's proposed corresponding structure is correct.

   Defendants object to Plaintiff's inclusion of Figure 5 as corresponding structure because,

apparently, Defendants believe Figure 5 does not show the "attachment surface" secured to the

"illumination surface."  However, as discussed above in connection with Defendants' written

description argument, a skilled artisan studying Figure 5 would understand that the "attachment

surface" is secured to the "illumination surface," as is plainly depicted.  (*See supra* at 32-33.)

Defendants next contend that "etc" should not be included as corresponding structure because it

does not "specifically disclose" structure.  However, viewed in context, the "etc" makes clear

that the corresponding structure was not limited to just the specific "fastening mechanisms"

listed.  (A012 ('747 patent) at 9:48-51.)  Rather, the corresponding structure includes "fastening

mechanisms" that a skilled artisan would understand to be capable of performing the recited

---

[26] The presence of language in the specification imparting structural significance to the term "fastening mechanism" is in contrast to facts of *Williamson*.  792 F.3d at 1351 (although [the term] is described in a certain level of detail in the written description, the written description fails to impart any structural significance to the term.").

functions. *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1382 (Fed. Cir. 2001) (finding that a generic reference in the specification to a "commercially available vacuum sensor" to be appropriate corresponding structure because it "would be understood by one skilled in the art as structure capable of performing the function recited in the claim limitation."). Accordingly, to the extent § 112, ¶ 6 is found to apply to this limitation, the corresponding structure should include the structure depicted in Figure 5 and "etc."[27]

#### 4.      Defendants' Sur-Reply Position

Blackbird argues that prefix words always function as adjectives (*supra* at 71), and that the issue is not "how the words are grammatically classified," but rather how the words are understood by persons of ordinary skill in the art. (*Supra* at 72.) Blackbird is only partially right. The issue indeed is how the words are understood by persons of ordinary skill, but courts should use all the tools available to determine that understanding, and consideration of the part of speech of the prefix words is one such tool. As the cited cases illustrate, prefix words that are nouns can provide sufficient structure (*see, e.g.*, *Greenberg v. Ethicon Endo Surgery, Inc.*, 91 F.3d 1580, 1582-84 (Fed. Cir. 2008) ("detent mechanism") and *Personalized Media Commc'ns , LLC v. Int'l Trade Commn.*, 161 F.3d 696, 703-05 (Fed. Cir. 2011) ("digital detector")), but that is not always the case (*see Massachusetts Inst. of Tech. v. Abacus Software*, 462 F.3d 1344, 1353-55 (Fed. Cir. 2006) ("colorant selection mechanism")).[28]

---

[27] Defendants also object to the fact that Plaintiff's proposed construction does not include a "double-sided adhesive strip." (*Supra* 70.) Plaintiff believes that "double-sided adhesive strips" are encompassed within "adhesive strips," which is part of Plaintiff's proposed construction. Plaintiff has no objection to also including "double-sided adhesive strips."

[28]  Nouns can function as adjectives yet still remain nouns. For example, "paper towels" consists of two nouns, but "paper" *functions* as an adjective to describe the type of "towels." Numerous other examples abound (*e.g.*, "race horse," "tennis balls"). In these situations, the first noun is referred to as a "noun as adjective." (*See, e.g.*, *https://www.englishclub.com/grammar/nouns-adjective.htm* (last visited on November 14, 2016); *http://grammarist.com/grammar/nouns-as-adjectives/* (last visited on November 13, 2016)).

Defendants do not contend that determining if means-plus-function principles apply is as simple as assessing the part of speech of the prefix words and stopping there.  Rather, Defendants contend that identifying the proper part of speech is a tool, just like the specification and prosecution history are tools, to understand what claim terms mean to a person of ordinary skill.  As the Federal Circuit's decisions instruct, the focus is on whether the prefix words indicate sufficient structure or have a well-defined meaning in the art.  "Fastening" is an adjective that does not connote structure, but instead describes an action.  Blackbird does not offer a dictionary definition of "fastening" (offering one for "fasten," instead), nor a declaration from an expert or a person of ordinary skill in the art.[29]  Blackbird's only evidence is the repeated assertion that a person of ordinary skill would understand the meaning of "fastening."

Blackbird also attempts to create a dispute where there is none, by arguing that it is permissible to use a "term directed to a broad category of structure[s]."  (*Supra* at 73.)  The question remains, however, whether a person of skill in the art would understand what is the category of structures referenced by the claim language.  Here, neither claim 12 nor Blackbird defines the relevant category of structure.  Instead, Blackbird merely asserts that "a skilled artisan would understand" that the claim refers to certain structures based on the description of "fastening mechanism" in the specification.  (*Supra* at 73.)  If Blackbird is suggesting that the category of structures covered by this claim element is limited to those specifically identified in the specification, as application of 35 U.S.C. § 112, ¶ 6 dictates, then Defendants agree.  If

---

[29]  *See* Plaintiff's Opening Position, *supra* at 59 and 60, and Plaintiff's Reply Position, *supra* at 72, 72 n.23, 73, 74, and 75.

Blackbird is suggesting that it need not identify any structure because a person of ordinary skill — and ultimately the jury — can "just figure it out," Defendants disagree.[30]

Blackbird argues that claim 12 describes how the "fastening mechanism" interacts with other components and likens the situation to that in *Inventio*. (*Supra* at 74.)  Blackbird is wrong. Claim 12 describes *what* the "fastening mechanism" does in relation to other components — which is to secure the "attachment surface" to the "illumination surface" — but not *how* it does so.  *Cf. Inventio AG v. ThyssenKrupp Elevator Americas Corp.*, 649 F.3d 1350, 1358 (Fed. Cir. 2011) (explaining that the claim at issue and other claims describe how the "modernizing device" performs certain functions); *M2M Solutions LLC v. Sierra Wireless Am., Inc.*, 2015 WL 5826816, C.A. Nos. 12-30-RGA, 12-32-RGA, and 12-33-RGA, at *5 (D. Del. Oct. 2, 2015) (finding "the claim limitation describes how this authentication process takes place in considerable detail.") (Footnote omitted).  Here, the prefix word "fastening" describes a function, not a thing, and it does not provide sufficient structure.  The claim limitation at issue should be construed as a means-plus-function limitation.

---

[30] Blackbird tries to have it both ways.  Blackbird admits that in *Lifeport Sciences* "the party seeking to avoid means-plus-function treatment improperly attempted to rely on structure disclosed only in the specification," but that "[h]ere, Blackbird relies on the specification only to establish that the claim term has a structural meaning …." (*Supra* at 74 n.25.)  But in the very next paragraph, Blackbird relies on structures disclosed only in the specification to argue the claim "connotes structure." (*See supra* at 74.)  The claim term at issue does not connote structure; the only structure described for the claimed "fastening mechanism" is in the specification.

Dated: November 22, 2016

OF COUNSEL:

Wendy Verlander
wverlander@blackbird-tech.com
Christopher Freeman
cfreeman@blackbird-tech.com
Sean K. Thompson
sthompson@blackbird-tech.com
Blackbird Tech LLC d/b/a
Blackbird Technologies
One Boston Place, Suite 2600
Boston, MA 02108
617.307.7100

STAMOULIS & WEINBLATT LLC

*/s/ Stamatios Stamoulis*
Stamatios Stamoulis #4606
stamoulis@swdelaw.com
Richard C. Weinblatt #5080
weinblatt@swdelaw.com
Two Fox Point Centre
6 Denny Road, Suite 307
Wilmington, DE 19809
Telephone: (302) 999-1540

*Attorneys for Plaintiff*
Blackbird Tech LLC d/b/a
Blackbird Technologies


MORRIS, NICHOLS, ARSHT & TUNNELL
LLP

OF COUNSEL:

John M. Hintz
MAYNARD, COOPER & GALE, P.C.
The Fred F. French Building
551 Fifth Avenue – Suite 2000
New York, NY  10176
(646) 609-9284
jhintz@maynardcooper.com

By:     */s/  Michael J. Flynn*
        Karen Jacobs (#2881)
        Michael J. Flynn (#5333)
        1201 North Market Street
        P.O. Box 1347
        Wilmington, DE 19899
        (302) 351-9661
        kjacobs@mnat.com
        mflynn@mnat.com

*Attorneys for Defendants ELB Electronics, Inc.,*
*and Feit Electric Company, Inc.*

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

D. Peter Hochberg
Walter | Haverfield LLP
The Tower at Erieview
1301 East 9th Street, Suite 3500
Cleveland, OH  44114-1821
(216) 928-2903
(216) 916-2445
dphochberg@walterhav.com

By:   */s/ Philip A. Rovner*
      Philip A. Rovner (#3215)
      Jonathan A. Choa (#5319)
      Alan R. Silverstein (#5066)
      Hercules Plaza
      P.O. Box 951
      Wilmington, DE  19899
      (302) 984-6000
      provner@potteranderson.com
      jchoa@potteranderson.com
      asilverstein@potteranderson.com

*Attorneys for Defendant ETi Solid State Lighting Inc.*

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

David C. Radulescu, Ph.D.
Tigran Vardanian
RADULESCU LLP
350 Fifth Avenue, Suite 6910
New York, NY 10118
(646) 502-5950
david@radip.com
tigran@radip.com

By:   */s/ Philip A. Rovner*
      Philip A. Rovner (#3215)
      Jonathan A. Choa (#5319)
      Alan R. Silverstein (#5066)
      Hercules Plaza
      P.O. Box 951
      Wilmington, DE  19899
      (302) 984-6000
      provner@potteranderson.com
      jchoa@potteranderson.com
      asilverstein@potteranderson.com

*Attorneys for Defendant PlusRite USA Corp.*

## CERTIFICATE OF SERVICE

I hereby certify that on November 22, 2016, I electronically served the forgoing document on all counsel of record in this action.

*/s/ Stamatios Stamoulis*
Stamatios Stamoulis #4606