IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BLACKBIRD TECH LLC d/b/a
BLACKBIRD TECHNOLOGIES,

                Plaintiff,

    v.

ELB ELECTRONICS, INC., et al.,

                Defendants.

Civil Action No. 15-056-RGA

## MEMORANDUM OPINION

Stamatios Stamoulis and Richard C. Weinblatt, STAMOULIS & WEINBLATT LLC, Wilmington, DE; Wendy Verlander and Jeffrey D. Ahdoot, BLACKBIRD TECH LLC, Boston, MA; David Gerasimow, THE LAW OFFICES OF DAVID A. GERASIMOW, P.C., attorneys for Plaintiff.

Karen Jacobs and Michael J. Flynn, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; John M. Hintz, MAYNARD, COOPER & GALE, P.C., New York, NY; Sarah Rose Daley, MAYNARD, COOPER & GALE, P.C., Birmingham, AL, attorneys for Defendants.

September 9, 2020

/s/ Richard G. Andrews
**ANDREWS, U.S. DISTRICT JUDGE:**

  This is a consolidated patent case about LED light fixtures. Plaintiff Blackbird Tech alleges ELB Electronics (Defendant in Civ. Act. No. 15-56-RGA) and Feit Electric Company (Defendant in Civ. Act. No. 15-58-RGA) infringe U.S. Patent No. 7,086,747 ('747 patent). Before me is Defendants' Motion to Dismiss for Lack of Standing and Motion for Summary Judgment. (D.I. 125). I have reviewed the briefing. (D.I. 126, 135, 139, 155, 156). For the reasons discussed below, the Motion to Dismiss for Lack of Standing is denied, and the Motion for Summary Judgment is granted in part and denied in part.

**I. BACKGROUND**

  The '747 patent discloses an "energy-efficient lighting apparatus." ('747 patent at Abstract). Plaintiff asserts claim 12:

> An energy-efficient lighting apparatus for retrofit with an existing light fixture having a ballast cover, comprising:
>   a housing having an attachment surface and an illumination surface;
>   a plurality of illumination surface holes in the illumination surface;
>   a circuit board comprising a plurality of light-emitting diodes, wherein the circuit board is positioned adjacent the housing so that the plurality of light-emitting diodes protrude through the plurality of illumination surface holes in the illumination surface; and
>   a fastening mechanism for securing the attachment surface of the lighting apparatus to the illumination surface, wherein the lighting apparatus is coupled to a wall switch and wherein the illumination of the light-emitting diodes is controllable based upon the position of the wall switch.

('747 patent at 11:26-42). The specification explains that the "ballast" is a component that maintains a current through the light bulbs to illuminate them. (*Id.* at 5:12-14). The "ballast cover" covers the ballast and other wiring. (*Id.* at 5:2-4).

  Plaintiff claims ELB and Feit Electric infringe claim 12 by making and selling dozens of models of tube-shaped LED light bulbs. (D.I. 128-1, Ex. J ¶ 1; D.I. 128-2, Ex. K ¶ 1).

1

## II. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011).

The moving party bears the initial burden of demonstrating the absence of material issues of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007). Summary judgment should be granted if the court finds, in consideration of all the evidence, that no reasonable trier of fact could find for the non-moving party. *Matsushita*, 475 U.S. at 588.

## III. DISCUSSION

### A. Blackbird's Ownership of the '747 Patent

Defendants argue Plaintiff does not actually own the '747 patent, and it therefore lacks standing to bring this lawsuit. "[T]he touchstone of constitutional standing in a patent infringement suit is whether a party can establish that it has an exclusionary right in a patent that, if violated by another, would cause the party holding the exclusionary right to suffer legal injury." *WiAV Sols. LLC v. Motorola, Inc.*, 631 F.3d 1257, 1265 (Fed. Cir. 2010). "[I]f a patentee transfers 'all substantial rights' to the patent, this amounts to an assignment or a transfer of title,

which confers constitutional standing on the assignee to sue for infringement in its own name alone." *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1340 (Fed. Cir. 2007). "Standing is a jurisdictional matter," and "[a]bsent Article III standing, a federal court does not have subject matter jurisdiction to address a plaintiff's claims, and they must be dismissed." *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016). The party bringing an action has the burden to show it has standing. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (2004).

The '747 patent lists Lyman Nielson and Norman Hess of Fruit Heights, Utah as the inventors. On December 9, 2002, just before Nielson and Hess filed their provisional patent application, they signed an agreement assigning the "entire right, title and interest" in their invention, and in all "later filed applications claiming priority" to the provisional application, to the "Hess & Nielson Partnership, a corporation of the State of Utah." (D.I. 128, Ex. B at 3). On April 4, 2004, Nielson and Hess signed another agreement, this time assigning the rights in the patent application to "SAFEexits, Inc." (*Id.*, Ex. D). SAFEexits later changed its name to SURETEC Energy Innovations, Inc. (*Id.*, Ex. E), and SURETEC assigned its rights in the patent to Plaintiff Blackbird in 2014. (*Id.*, Ex. F).

Defendants argue that because Nielson and Hess first assigned the patent to the "Hess & Nielson Partnership, a corporation of the State of Utah," they could not later, in their individual capacities, assign the patent to SAFEexits, Inc. Under this theory, the patent still belongs to the "Hess & Nielson Partnership." Plaintiff responds that this entity never existed. The inventors just intended to use it as a "placeholder" because they had not yet settled on a name for their corporation. (D.I. 135 at 8-9). Since the entity never existed, Plaintiff argues, then any agreement assigning it the patent is void, and the later assignment to SAFEexits, Inc. was valid.

3

Defendants do not argue that Nielson and Hess ever created a formal corporation named the "Hess & Nielson Partnership," but they argue that, under Utah law, Nielson and Hess had formed a partnership by "working together." (D.I. 139 at 3). Thus, according to Defendants, the first agreement was valid because the "Hess & Nielson Partnership" did exist at the time.

Utah law, however, requires more than two people merely "working together" to form a partnership. It requires the "the association of two or more persons to carry on as co-owners [of] a business for profit." Utah Code Ann. § 48-1d-202. The case cited by Defendants, *Ogden Packing & Provision Co. v. Wyatt*, similarly requires that the individuals "joined together to carry on the business for their common interest in the profits and that the business was carried on pursuant to such arrangement." 204 P. 978, 983 (Utah 1922). While Nielson and Hess planned to commercialize their invention, Defendants have not provided details on the inventors' plans to share profits. (D.I. 139 at 3).

Regardless of whether Nielson and Hess formed a partnership under Utah law, I conclude that the first agreement was void. They assigned the patent rights not to a partnership, but to "Hess & Nielson Partnership, a *corporation* of the State of Utah." (Emphasis added). It is undisputed that there was never a corporation with that name. Therefore, the plain language of the contract assigned the patent to an entity that did not exist. *See Glenn v. Reese*, 225 P.3d 185, 188–89 (Utah 2009) ("Where the language is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language.") (cleaned up). Thus, the contract was void. *See Miller v. Celebration Mining Co.*, 29 P.3d 1231, 1239 (Utah 2001) ("Clearly, a contract is void as to the corporation itself post dissolution."). Given that there is no other dispute about the chain of assignments of this patent, I conclude Plaintiff owns the patent, and Plaintiff has standing to sue.

### B. Validity Under Section 112

A valid patent must meet the written description and enablement requirements of Section 112 of the Patent Act:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

35 U.S.C. § 112, ¶ 1.[1]

Written description and enablement are two distinct requirements. *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1344 (Fed. Cir. 2010). That is, the specification must contain both a "written description of the invention" and a "written description . . . of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art . . . to make and use" it.

To meet the first requirement, the description must "clearly allow persons of ordinary skill in the art to recognize that the inventor invented what is claimed." *Id.* at 1351 (cleaned up). The test is "whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Id.* This inquiry is a question of fact. *Id.* Invalidating a patent claim (on any basis) requires a showing by clear and convincing evidence. *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1072 (Fed. Cir. 2005).

---

[1] The Leahy-Smith America Invents Act (AIA) amended Section 112, but the new version only applies to patent applications filed on or after September 16, 2012. Because the provisional application for the '747 patent was filed on December 11, 2002, the pre-AIA Section 112 applies.

Defendants argue[2] that the disclosure of the '747 patent does not convey to a person of ordinary skill in the art (POSA) that the inventors possessed a "fastening mechanism for securing the attachment surface of the lighting apparatus to the illumination surface," as required by claim 12. (D.I. 126 at 22). Defendants acknowledge that the specification discloses a "fastening mechanism." But they argue that the specification only proposes that the "fastening mechanism" could secure the "attachment surface" to the "ballast cover"—not to the "illumination surface." (*Id.* at 22-23).[3]

Plaintiff responds by pointing to Figure 5 of the specification:



Fig. 5

This figure is a side view of one embodiment, which would retrofit existing light fixtures. The specification identifies 530 as the attachment surface and 532 as the illumination surface (both circled in red above). ('747 patent at 9:19-20). These are opposite surfaces of the housing 528 (circled in blue above). Dr. Valencia Koomson, Plaintiff's expert, concludes that this figure depicts the attachment surface secured to the illumination surface via the side walls of the

---

[2] I do mean "argue" because, as Plaintiff points out, the argument does not rely on any expert testimony about what a POSA would understand from the specification.
[3] The patentee originally drafted claim 12 as requiring "a fastening mechanism for securing the attachment surface of the lighting apparatus to the ballast cover." (D.I. 128, Ex. I at 120). After the patent examiner initially rejected the application, the patentee replaced "ballast cover" in this claim with "illumination surface." (*Id.* at 12). The specification, however, remained the same.

housing. (D.I. 136-4, Ex. C-2, "Koomson Validity Report," ¶ 314). She further concludes that a POSA would understand this diagram discloses a "fastening mechanism" securing these surfaces together. (*Id.* ¶ 316). I construed a "fastening mechanism" to mean a "fastener." (D.I. 71). The specification explains that the fastening mechanism could use an "adhesive strip" or "a magnet, clips, screws, etc." ('747 patent at 9:40-41, 9:48-50). Dr. Koomson explains:

> In my opinion, one of skill in the art would know that any of these same fastening mechanisms could be used to secure the attachment surface to the illumination surface, as schematically depicted in Fig. 5. Securing surfaces of the ballast cover and the attachment surface together is the same as securing surfaces of the illumination surface and the attachment surface together.

(Koomson Report ¶ 314).

Defendants argue that Dr. Koomson misidentifies the "fastening mechanism" in this diagram. The specification labels 534 as a "fastening mechanism," and it explains that this "fastening mechanism" secures the "attachment surface" to the "ballast cover" (which is not shown in Figure 5). ('747 patent at 9:36-39). The specification, however, does not dictate that there is only one fastening mechanism in this drawing. While the specification does not label any other fastening mechanisms, Dr. Koomson writes that a POSA would understand that Figure 5 "is a schematic drawing, not intended to depict every detail of the system." (Koomson Report ¶ 316). According to Dr. Koomson, a POSA would infer that the side walls of the housing connect the two surfaces using adhesive strips, screws, or other well-known techniques. (*Id.* ¶ 315).

It is unclear to me whether Plaintiff's theory is that the "fastening mechanism" includes the side walls in Figure 5 or whether the "fastening mechanism" is only the glue, screws, or other binding elements. If the fastening mechanism does not include the side walls, then I do not believe a POSA could say Figure 5 depicts the fastening mechanism securing the attachment surface "to the" illumination surface, as required by claim 12. It would be securing both surfaces

7

to the side walls. If the side walls, however, are part of the "fastening mechanism" (along with the glue, screws, etc.), then that "fastening mechanism" could be securing the attachment surface "to the" illumination surface. Even under this theory, the two surfaces in Figure 5 are not touching each other, but the specification clarifies that "the terms 'securing' and 'secured' do not require direct contact." ('747 patent at 9:20-21). Thus, viewing the evidence in the light most favorable to Plaintiff, I conclude there is a genuine dispute over whether Figure 5 shows the inventors invented a "fastening mechanism for securing the attachment surface of the lighting apparatus to the illumination surface." A reasonable jury could conclude Defendants have failed to provide clear and convincing evidence of a lack of written description of that claim element.

The second Section 112 issue here is whether the specification would enable a POSA to make and use the invention. This requirement is met if a POSA, after reading the specification, could practice the invention without "undue experimentation." *Cephalon, Inc. v. Watson Pharm., Inc.*, 707 F.3d 1330, 1336 (Fed. Cir. 2013). Enablement is a question of law based on underlying factual inquiries. *Id.*

Defendants' enablement argument mostly repeats their written description argument. They argue that the '747 patent does not disclose a "fastening mechanism for securing the attachment surface of the lighting apparatus to the illumination surface," and that without this disclosure, the specification cannot teach a POSA how to make and use the invention. (D.I. 126 at 26). Dr. Koomson responds that "one of skill in the art would need minimal, if any, experimentation to make and use the invention of claim 12, particularly the simple technology used to secure the attachment surface to the illumination surface." (Koomson Report ¶ 325). I agree that a person of ordinary skill would have little trouble using screws or other fasteners to

8

secure the two surfaces together. Accordingly, I will deny Defendants' summary judgment motion for lack of enablement.

Defendants' third Section 112 argument is that claim 12 is invalid as indefinite. Section 112 requires that the "specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112, paragraph 2. "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). Indefiniteness is a question of law. *Cox Commc'ns, Inc. v. Sprint Commc'n Co. LP*, 838 F.3d 1224, 1228 (Fed. Cir. 2016).

Again, Defendants focus on the "fastening mechanism for securing the attachment surface of the lighting apparatus to the illumination surface." They argue this language renders claim 12 indefinite because it is "broader than the disclosure in the specification." (D.I. 126 at 28). The cases Defendants cite for this position, however, are about Section 112's written description requirement, not its definiteness requirement. *See Carnegie Mellon Univ. v. Hoffmann-La Roche Inc.*, 541 F.3d 1115, 1127 (Fed. Cir. 2008); *Cooper Cameron Corp. v. Kvaerner Oilfield Prod., Inc.*, 291 F.3d 1317, 1323 (Fed. Cir. 2002); *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1479 (Fed. Cir. 1998). The question in an indefiniteness inquiry is whether a POSA would understand the scope of the claim with reasonable certainty. *Nautilus*, 572 U.S. at 901. Defendants do not explain why a POSA would be uncertain about the scope of a "fastening mechanism" that secures an "attachment surface" to an "illumination surface." Thus, I will deny Defendants' summary judgment motion for indefiniteness.

9

### C. Direct Infringement

A patent is infringed when a person "without authority makes, uses, offers to sell, or sells any patented invention, within the United States . . . during the term of the patent . . . ." 35 U.S.C. § 271(a). "Literal infringement of a claim exists when every limitation recited in the claim is found in the accused device." *Kahn v. Gen. Motors Corp.*, 135 F.3d 1472, 1477 (Fed. Cir. 1998).

Defendants argue that their products do not have the "housing" limitation described in the asserted claim. Claim 12 recites "a housing having an attachment surface and an illumination surface." I construed "housing" to mean a "structure that encloses other components." (D.I. 71). I explained that the housing must be a "physical thing" and not just the sum of the "illumination and attachment surfaces." (D.I. 69 at 6-7). Defendants argue Plaintiff has failed to identify a "housing" structure in the accused products that is more than just those two surfaces.

According to Plaintiff, the accused products fall into three categories:

(1) accused products in which the circuit board is enclosed by a housing comprising at least a solder mask (the "illumination surface"), a flat metal surface (the "attachment surface"), and metal tracks securing these two surfaces (the "fastening mechanism") and wrapping around the circuit board (collectively, "structure that encloses other components") . . .
(2) accused products in which the circuit board is enclosed by a housing comprising at least a solder mask (the "illumination surface"), a concave portion of plastic tubing below the circuit board (the "attachment surface"), and plastic tracks securing these two surfaces (the "fastening mechanism") and wrapping around the circuit board (collectively, "structure that encloses other components") . . .
(3) accused products in which the circuit board is enclosed by a housing comprising at least a solder mask (the "illumination surface") and a concave portion of glass tubing below and wrapping around the sides of the circuit board (the "attachment surface") ("structure that encloses other components") . . . In this third type of accused product, an adhesive lies between the glass attachment surface and the circuit board to secure the attachment surface to the illumination surface.

(D.I. 135 at 21-22).

Dr. Koomson writes that, for all three categories, the housing is comprised of "at least the illumination surface, attachment surface, and the fastening mechanism." (D.I. 128-1, Ex. J ¶¶ 69, 126, 181, 233, 284; D.I. 128-2, Ex. K ¶¶ 68, 128, 177, 227, 277). She explains that, in some of the accused products, the fastening mechanism is a set of tracks "wrapping around the side of the circuit board." (D.I. 128-1, Ex. J ¶¶ 100, 157, 209, 260, 312; D.I. 128-2, Ex. K ¶¶ 96, 150, 250). In other accused products, the fastening mechanism is an adhesive strip or glue, and the attachment surface is a "glass tube" or a "partially rounded glass surface." (D.I. 128-1, Ex. J ¶ 74; D.I. 128-2, Ex. K ¶ 179).

Defendants argue that, in the accused products, the circuit board is not "enclosed," and therefore the housing element is not met. Although Dr. Koomson's report includes photographs of the accused products, the parts are disassembled, and it is difficult to tell whether the circuit boards are fully "enclosed." If the tracks or glass tubes fully wrap around the circuit board such that the circuit board is not partially exposed, then the products could be said to contain a "structure that encloses other components." Viewing Dr. Koomson's descriptions in the most favorable light to Plaintiff, a reasonable jury could conclude the accused products meet the housing claim element. I therefore conclude this is a genuine dispute of material fact.

The next issue is whether, in the accused products, the "lighting apparatus is coupled to a wall switch." There is no dispute that the accused products, which are various models of LED light bulbs, do not contain a wall switch. In fact, Plaintiff's expert, Dr. Koomson, acknowledged that "the wall switch is not part of the accused product." (D.I. 129, Ex. N ¶ 41). Plaintiff points to the preamble of claim 12, which recites, "An energy-efficient lighting apparatus for retrofit with an existing light fixture having a ballast cover." The parties agreed the preamble was limiting, and I construed it to mean: "An LED lighting apparatus for installation in an existing light fixture

11

having a ballast cover." (D.I. 71). Plaintiff argues that, because claim 12 is directed to an apparatus that is "for installation" in existing fixtures, the apparatus does not need to include the "wall switch." Rather, it just needs to be *capable* of installation into existing fixtures that are coupled to wall switches.

"Unless the claim language only requires the capacity to perform a particular claim element, . . . it is not enough to simply show that a product is capable of infringement; the patent owner must show evidence of specific instances of direct infringement." *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1329 (Fed. Cir. 2010). While the preamble of claim 12 is directed to an apparatus "for retrofit," the claim does not use the kind of language that would suggest the lighting apparatus merely needs to be capable of being "coupled to a wall switch." Even accepting that the "light fixture having a ballast cover" is not part of the claimed invention, the "energy-efficient lighting apparatus" indisputably is. Claim 12 teaches that "the lighting apparatus *is* coupled to a wall switch." (Emphasis added). There is no dispute that the accused products do not contain a wall switch. "If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law." *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000). Thus, Defendants are entitled to summary judgment of no direct infringement.

### D. Indirect Infringement

Under 35 U.S.C. § 271(b), "[w]hoever actively induces infringement of a patent shall be liable as an infringer." A plaintiff must show "the defendant knew of the patent and knew as well that the induced acts constitute patent infringement." *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 135 (2015). "A patentee may prove . . . inducement of infringement by either direct or

circumstantial evidence." *Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1219 (Fed. Cir. 2006).

Defendants do not dispute they knew of the '747 patent, but they argue one issue – Plaintiff has failed to produce evidence that Defendants knew its customers' acts constituted infringement. (D.I. 126 at 32). Plaintiff responds by pointing to installation instruction manuals that Defendants provided to their customers. (D.I. 135 at 27). The manuals include step-by-step instructions on how to install the LED lamps and to flick a switch to turn them on. (D.I. 128-1, Ex. J ¶¶ 115-117). Instructions can support a finding of induced infringement if the instructions "evidence intent to *encourage* infringement." *Takeda Pharm. U.S.A., Inc. v. W.-Ward Pharm. Corp.*, 785 F.3d 625, 631 (Fed. Cir. 2015) (emphasis in original). "The question is not just whether instructions describe the infringing mode, but whether the instructions teach an infringing use of the device *such that* we are willing to infer from those instructions an affirmative intent to infringe the patent." *Id.* (cleaned up) (emphasis in original).

I conclude a reasonable jury could infer an intent to encourage infringement based on these instructions. This is not a case where the instructions describe multiple possible non-infringing modes. The instructions show only one installation method, which involves coupling the lights to a wall switch (the missing element for direct infringement). The instructions include pictures of the wall switch and describe "quick and simple" steps for installing the LED lamps and turning them on. (D.I. 128-1, Ex. J ¶¶ 115-117). Thus, there is a genuine dispute of material fact for induced infringement.

The next issue is contributory infringement. Section 271(c) provides:

> Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially

13

> made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

35 U.S.C. § 271(c).

To establish contributory infringement, a plaintiff must show: "1) that there is direct infringement, 2) that the accused infringer had knowledge of the patent, 3) that the component has no substantial noninfringing uses, and 4) that the component is a material part of the invention." *Fujitsu*, 620 F.3d at 1326. "Non-infringing uses are substantial when they are not unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental. In assessing whether a use is substantial, the fact-finder may consider the use's frequency, the use's practicality, the invention's intended purpose, and the intended market." *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1362 (Fed. Cir. 2012) (cleaned up).

Defendants focus on the third element, arguing that there are substantial non-infringing uses of their products. Plaintiff's expert, Dr. Koomson, acknowledges that the accused products are used without connections to wall switches, such as "in egress corridors and in the New York City subway system" where they are "required to remain illuminated at all times." (D.I. 128-2, Ex. K ¶ 112). She concludes, however, that these uses are "insubstantial." I disagree. Most customers may connect the accused LED lights to wall switches, but that does not mean that the uses without wall switches are insubstantial. Plaintiff has the burden to produce evidence that any non-infringing uses are insubstantial. *Toshiba*, 681 F.3d at 1363. Given the size of the New York City subway system alone (just one example of a non-infringing use), no reasonable jury could find the non-infringing uses are "unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental." *Id.* at 1362. The lights are apparently used in a non-infringing manner every day in a massive transit system. That is certainly a frequent and practical use of the

component. *See id.* Thus, Defendants are entitled to summary judgment of no contributory infringement.

### E. Willfulness, Enhanced Damages and Attorneys' Fees

Under 35 U.S.C. § 284, District Courts may award enhanced damages for patent infringement, but such damages are "generally reserved for egregious cases of culpable behavior." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1932 (2016). Enhanced damages can be warranted if a defendant's conduct was "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate." *Id.*

Section 285 provides that courts "in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. "[A]n 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014).

Defendants seek summary judgment of no willfulness (D.I. 126 at 36-37) and on Plaintiff's claims for enhanced damages and attorneys' fees (*id*. at 37-38).

Plaintiff essentially concedes summary judgment of no willfulness: "Defendants seek the 'dismissal' of Blackbird's 'claim for willful infringement. . . . Blackbird does not have any such 'claim.'" (D.I. 135 at 33). Plaintiff has pointed to "Defendants' ongoing acts of infringement" (*id*. at 34), which is not, by itself, enough to go to trial on a claim of willful infringement. Thus, I will grant Defendants' motion for summary judgment of no willfulness.

As for the enhanced damages claim, Plaintiff seems to suggest that enhanced damages are possible without a finding of willful infringement. Defendants argue that they are not. Neither

15

cites so much as a district court case that clearly resolves the dispute. Rather than decide the issue on fairly cursory briefing, I think the better course is to deny Defendants' motion as premature. To make sure there is no mistake, my understanding is that enhanced damages is an issue for a judge, not for a jury. Willfulness is an issue for a jury, but, based on the above ruling, willfulness is not an issue for the jury in this case. Neither is enhanced damages.

I will deny the motion for summary judgment of no attorneys' fees as premature. Attorneys' fees may be awarded if a case "stands out from others with respect to the substantive strength of a party's litigating position" or if the case is litigated in an "unreasonable manner." This case has not been fully litigated yet. I cannot responsibly determine either of these issues at this point.

### F. Infringement During Appeal

On February 23, 2017, based on my claim construction order, the parties stipulated that Plaintiff could not prove infringement of the '747 patent, and I entered judgment in favor of Defendants. (D.I. 75). Plaintiff appealed to the Court of Appeals for the Federal Circuit, which reversed my construction of one claim term. The Federal Circuit remanded this action on September 21, 2018. (D.I. 82).

Defendants argue they are not liable for any acts of infringement that occurred between February 23, 2017 and September 21, 2018. They have not, however, cited any authority supporting the proposition that defendants are not liable for patent infringement that occurs while a case is on appeal. If direct infringement – based on strict liability – were at issue, I would agree with Plaintiff. It is perhaps a slightly more complicated question whether Defendants can be liable for indirect infringement during a time when the parties stipulate that Plaintiff cannot prove infringement under the Court's claim construction. To prove indirect infringement,

16

Plaintiff has to show Defendants knew they were inducing or contributing to infringement. How can they know that during that time period? Nevertheless, I am going to deny summary judgment on this issue since the briefing on it is cursory from both sides. I will therefore deny Defendants' request for summary judgment of no liability between February 23, 2017 and September 21, 2018. I think the parties may need to consider this issue some more in connection with how it should be handled at trial.

## IV.     CONCLUSION

For these reasons, Defendant's Motion to Dismiss for Lack of Standing is DENIED. The Motion for Summary Judgment of invalidity under Section 112 is DENIED; the Motion for Summary Judgment of no direct infringement is GRANTED; the Motion for Summary Judgment of no induced infringement is DENIED; the Motion for Summary Judgment of no contributory infringement is GRANTED; the Motion for Summary Judgment of no attorneys' fees is DENIED; the Motion for Summary Judgment of no willfulness is GRANTED; the Motion for Summary Judgment of no enhanced damages is DENIED; and the Motion for Summary Judgment of no liability between February 23, 2017 and September 21, 2018 is DENIED.